UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MARTEL, ET AL.,  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>MAURA HEALEY, in her Official Capacity as  )<br>Attorney General of the Commonwealth of  )<br>Massachusetts,  )<br>)<br>Defendant.  )<br>)<br>)<br>) | 1:17-cv-10248 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF PLAINTIFFS'**

**MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs submit this memorandum of law, along with their accompanying statements, in support of their motion for a preliminary injunction.

## INTRODUCTION

A Taser is a conducted electrical weapon that shoots two wired probes into the skin of the target using a compressed nitrogen gas propellant. The probes then emit an electrical pulse lasting a few seconds that causes involuntary muscle contractions and temporarily impaired motor skills or involuntary immobilization. *See* http://www.taser.com/self-defense; http://www.taser.com/research-and-safety/how-a-taser-works. A stun gun emits a similar electrical charge, but requires closer contact as the device must make contact with the target's skin. Mass. Gen. Law. ch. 140 § 131J establishes an absolute ban on the possession, sale, or use of all electrical weapons, even in the home, including Tasers or stun guns, with exceptions only for certain law enforcement officers acting in the course of their official duties and dealers selling to law enforcement. Section 131J states, "No person shall possess a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." Section 131J also prohibits the sale of electrical weapons to anyone other than law enforcement agencies. The penalty for violation of section 131J is a fine ranging from $500 to $1000, imprisonment from six months to two and one half years, or both.

Plaintiffs are all residents of Massachusetts. *See* Exhibits 1-3. Plaintiffs Martel and Bates are licensed to carry concealed firearms in the state of Massachusetts and have extensive training in firearms and self-defense. *See* Exhibits 1-2. Plaintiff Major has moral objections to using firearms even in self-defense. *See* Exhibit 3. Based upon Plaintiffs' training and experience, Plaintiffs each believe there are certain situations in which they would prefer to carry

a Taser or stun gun in lieu of a more deadly firearm for self-defense purposes.  Plaintiffs wish to

purchase and possess Tasers or stun guns for lawful self-defense purposes and would do so but

for their fear of prosecution, fines, and imprisonment under Section 131J.  Defendant's

enforcement of Section 131J therefore violates Plaintiffs' Second Amendment rights (as

incorporated into the Fourteenth Amendment) and irreparably injures Plaintiffs on an ongoing

basis.  Plaintiffs filed this lawsuit to challenge this unconstitutional practice and now seek

preliminary injunctive relief to abate these ongoing injuries.

## ARGUMENT

The Second Amendment to the United States Constitution protects the right to keep and

bear arms including non-lethal arms such as Tasers and stun guns, and Massachusetts complete

ban on the possession and sale of electrical weapons violates this right.  Plaintiffs--all residents

of Massachusetts--have suffered and continue to suffer irreparable harm from the ban.  If

Defendant is not preliminarily enjoined from enforcing the ban, Plaintiffs will continue to suffer

irreparable harm during the course of this litigation.  Money damages cannot compensate for this

harm.  The Commonwealth of Massachusetts has no valid interest in violating its residents'

constitutional rights.

While the traditional function of a preliminary injunction is to maintain the status quo

during litigation so that the court can render a decision on the merits, this "status quo doctrine" is

not mechanically applied.  It is discretionary with the court, particularly in cases such as this,

where the status quo entails Plaintiffs suffering an ongoing deprivation of their constitutional

rights.  *Crowley v. Local No. 82*, 679 F.2d 978, 995 (1st Cir. 1982)  *rev'd on other grounds by*

467 U.S. 526 (1984).  "If the currently existing status quo itself is causing one of the parties

irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by

returning to the last uncontested status between the parties, . . . by the issuance of a mandatory injunction, . . . or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.  The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.* at 995-96 (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)).  *See also Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (the focus must be on prevention of injury not merely preservation of the status quo).

In determining whether to grant a preliminary injunction, this Court should consider the following four factors:  (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of the hardship to the non-movant if enjoined contrasted with the hardship to the movant if no injunction issues; and (4) the effect, if any, that the injunction or its withholding will have on the public interest.  *Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) (affirming a grant of preliminary injunction enforcing a restrictive covenant); *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 75 (1st Cir. 2005) (affirming a grant of preliminary injunction ordering payments to a medicaid provider which was about to enter foreclosure proceedings); *Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996) (affirming a grant of preliminary injunction compelling the defendant to continue to sell products to the plaintiff under their contract).

Though each factor is important, the First Circuit has repeatedly held that the likelihood of success on the merits is the most important part of the preliminary injunction assessment and has referred to it as the "main bearing wall of the four-factor framework." *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013); *Sindicato Puertorriqueno De*

*Trabajadares, SEIU Local 1996 v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (enjoining a campaign finance law that restricted labor unions' First Amendment rights); *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007); *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("[t]he sine qua non of this four-part inquiry is likelihood of success on the merits"); *Ross-Simmons*, 102 F.3d at 16.  That said, at the preliminary injunction stage, the court needs only to *estimate* the likelihood of success—it need not "predict the eventual outcome on the merits with absolute assurance."  *Ross-Simmons*, 102 F.3d at 16.

## I.      Plaintiffs are likely to prevail on the merits in this case.

The Second Amendment on its face protects the "right to keep and bear *Arms*," not simply the right to keep and bear *guns* or *firearms*. U.S. Const., Am. II (emphasis added).  Because electrical weapons are "arms," their possession is protected by the Second Amendment.  Defendant cannot justify denying Plaintiffs their right to possess them.

### A.  Electrical weapons are arms under the Second Amendment.

In *District of Columbia v Heller*, 554 U.S. 570, 581 (2008), the Supreme Court explained the term "arms":

> The 18th-century meaning is no different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence."  Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."

(citations omitted).  Four more times during the course of examining the phrase "keep and bear arms" in *Heller*, the Court expressly referred to weapons other than firearms as "arms."  *Id.* at 581–92.

First, when explaining that "keep and bear arms" includes civilians possessing arms for self-defense, the Court referenced an "important 1771 legal dictionary" providing that "'Servants and labourers shall use bows and arrows on *Sundays, . . .* and not bear other arms.'" *Id.* at 581 (emphasis original, citation omitted). The phrase "*other* arms" (emphasis added) obviously meant that the dictionary understood bows and arrows to be arms. Accordingly, this reference would have been pointless—indeed, counter-productive—if the Court limited the definition of "arms" to firearms.

Later in that same section, the Court explained that various "legal sources frequently used 'bear arms' in nonmilitary contexts," and cited examples, one being the earlier dictionary quote referencing bows and arrows*, id.* at 587–88, and the other quoting a scholar: "Since custom has allowed persons of rank and gentlemen of the army to bear arms in time of peace, strict care should be taken that none but these should be allowed to wear swords." *Id.* at 587 n.10 (quoting E. de Vattel, *The Law of Nations, or, Principles of the Law of Nature* 144 (1792)). Both times the source (and thus, the Court) treated the word "arms" as including other weapons.

Later, responding to the dissent, the Court mentioned knives as "arms." The dissent pointed to an earlier proposed version of the Second Amendment that included a conscientious-objector provision in support of its view that the right to bear arms was limited to service in the military. The majority disagreed:

> [The deleted provision] was not meant to exempt from military service those who objected to going to war but had no scruples about personal gunfights. Quakers opposed the use of *arms* not just for militia service, but for any violent purpose whatsoever—so much so that Quaker frontiersmen were forbidden to use *arms* to defend their families, even though "[i]n such circumstances the temptation to seize a hunting rifle or *knife* in self-defense ... must sometimes have been almost overwhelming."

*Id.* at 590 (emphasis added) (citation omitted). The Court thus included knives alongside rifles as examples of "arms" for Second Amendment purposes.

*Heller* speaks mostly about guns because the plaintiff in *Heller* challenged an absolute ban on handguns.  But, the Court's extensive references to other weapons, show that Second Amendment rights are not limited to firearms.  Tasers and stun guns—easily carried for defense—constitute arms under the Second Amendment.  And the Court in *Heller* concluded that the Second Amendment codifies a preexisting "individual right to possess and carry *weapons* in case of confrontation."  *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added).  Later, in *McDonald v. Chicago*, 561 U.S. 742, 778 (2010), the Court incorporated this right against the states through the Fourteenth Amendment.

More recently, the Court unanimously reversed the Massachusetts Supreme Judicial Court's holding that stun guns were not protected arms because they were not in common use when the Second Amendment was enacted and because the record lacked evidence that they were readily adapted to military use.  *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).  The Supreme Court explained that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.  *Id.* at 1027 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)).  Of course, Tasers and stun guns were unknown when the Second Amendment was enacted, but *Heller* expressly rejected the view "that only those arms in existence in the 18th century are protected by the Second Amendment."  *Heller*, 554 U.S. at 582.  Instead, the Court held, "[j]ust as the First Amendment protects modern forms of communications [such as the Internet], and the Fourth Amendment applies to modern forms of search [such as heat detection devices], the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that

were not in existence at the time of the founding." *Id.* (citations omitted).  The Court also rejected the "proposition 'that only those weapons useful in warfare are protected.'" *Caetano*, 136 S. Ct. at 1028, quoting *Heller*, 554 U.S. at 624-25.

An outright ban that prohibits law-abiding residents from choosing a Taser or stun gun for self-defense is clearly unconstitutional.  Accordingly, in the past six months, four different state and local governments have recognized that their outright bans on electrical weapons do not pass constitutional muster, and have therefore settled litigation challenging the bans by enacting new more limited regulations and/or agreeing not to enforce the bans against the named plaintiffs while new legislation is pending.  *See Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. Nov. 16, 2016) Doc. No. 21 (letter from the New Jersey Attorney General recognizing that "an outright ban on possession of stun guns within a state, regardless of the contextual circumstances surrounding any such possession, would likely not pass constitutional muster" and requesting a stay for purposes of promulgating reasonable regulations); *Ford v. City of New Orleans*, No. 2:16-cv-16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19  (stipulating that the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that will "decriminalize the possession of a stun gun"); *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) (letter from the City of Annapolis informing the court that the City Council passed an emergency ordinance eliminating all restrictions on ownership and possession of electronic weapons for personal defense).

Likewise, the Michigan Court of Appeals recognized that following *Heller*, the Second Amendment "protect[s] a citizen's right to possess and carry Tasers or stun guns for self-defense, and the state may not completely prohibit their use by private citizens."  *People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons).

Because the Massachusetts ban significantly burdens the Plaintiffs' rights under the Second Amendment, and is not tailored to meet a significant government interest, Plaintiffs are entitled to a preliminary injunction against its enforcement.

### B.  Electrical weapons are neither "dangerous" nor "unusual."

While the Supreme Court in *Heller* recognized certain limits to the right to keep and bear arms, none of those are applicable here.  First, the Court noted that the Second Amendment does not extend to weapons "not typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  The Court also noted that "the sorts of weapons protected were those 'in common use.'" *Id.* at 627 (citation omitted).  The Court also acknowledged "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citation omitted).

Thus, "dangerous and unusual" weapons are historically excluded from the scope of the right, but this exception, by the Court's own words, is indeed limited to weapons that are not only "unusual" but also "dangerous."  Moreover, because all weapons are "dangerous" to some degree, the reference to "dangerous . . . weapons" must mean weapons that are more dangerous than the norm—logically meaning weapons that are unusually dangerous.

Whatever else might fall under that description, electrical weapons are not unusually dangerous weapons.  They are significantly less deadly than firearms, which are constitutionally

8

protected and broadly allowed in Massachusetts. They are less dangerous even than knives, clubs, baseball bats, or bare hands and fists. *See Caldwell v Moore*, 968 F.2d 595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation"). Nor are Tasers and stun guns unusual or rare. The fact that they are a modern invention does not make them so. *Caetano*, 136 S. Ct. at 1028. Use of electronic weapons are widespread in the United States. *See People v. Yanna*, 824 N.W.2d at 245 ("[h]undreds of thousands of (them) have been sold to private citizens, with many more in use by law enforcement officers."); Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 Stan. L. Rev. 199, 244 (2009); Taser State Requirements *https://buy.taser.com/taser-state-requirements/*. (Tasers and stun guns are currently restricted in only New Jersey, New York, Hawaii, Rhode Island, Massachusetts, and a few municipalities). Possession of electrical weapons by otherwise law-abiding citizens is legal for civilians in 45 states and Tasers are routinely used by nearly 94 percent of American police departments. *See* Hardy, *Taser's Latest Police Weapon: The Tiny Camera and the Cloud*, N.Y. Times, February 21, 2012 (available at http://www.nytimes.com/2012/02/21/technology/tasers-latest-police-weapon-the-tiny-camera-and-the-cloud.html?_r=0&pagewanted=print); Volokh, *Nonlethal Self-Defense*, 62 Stan. L. Rev. at 244.

   To be sure, all attacks have the potential to turn deadly: pushing or hitting back at an attacker could cause him to fall the wrong way and die. But Tasers and stun guns are so rarely deadly that they merit classification as non-deadly force, much closer to a punch or a shove than a gun shot. Since the *Heller* Court concluded that handguns are not sufficiently dangerous to fall

outside Second Amendment protection, then certainly, less dangerous electrical weapons are protected as well.

Likewise, though Tasers and stun guns can be used for crimes as well as for legitimate self-defense, that is true of any weapon.  The best estimates show that deliberate uses of Tasers are deadly in less than 0.01% of all cases, as compared to an estimated 20% death rate from gunshot wounds in deliberate assaults, and an estimated 2% death rate from knife wounds in deliberate assaults. Volokh*, supra*, 62 Stan. L. Rev. at 205.  This is why Tasers and stun guns are referred to as "nonlethal weapons."  *See id.* at 238.  Private arms ownership always poses some risks, but our nation's founders agreed that people are entitled to keep and bear arms *despite* the risk that some people will abuse them.  If that is true for deadly weapons like handguns, it is *especially* true for weapons that are almost entirely nonlethal, including Tasers and stun guns.

**C.  Section 131J prevents Plaintiffs from exercising their constitutional rights.**

Plaintiffs are residents of Massachusetts who wish to purchase and possess electrical weapons for lawful self-defense purposes.  Section 131J prohibits this activity, and Defendant enforces Section 131J.

The statements Plaintiffs submitted herewith establish that Plaintiffs, all residents of Massachusetts, would purchase and carry Tasers or stun guns for lawful self-defense, but that they fear arrest and prosecution for violating Section 131J.  *See* Exhibits 1-3.  Plaintiffs Martel and Bates are presently licensed to carry concealed firearms in Massachusetts.  *Id.* Exhibits 1-2. Section 131J is the only thing preventing them from purchasing and carrying a Taser or stun gun. All Plaintiffs plainly have standing to challenge Massachusetts' infringement of their Second Amendment rights.

Here, the Commonwealth of Massachusetts violates the Second Amendment when it enforces section 131J against average law-abiding citizens like Plaintiffs. Its very existence stands as a fixed harm repeatedly violating the Second Amendment rights of residents of Massachusetts like Plaintiffs every day it remains in effect.

### D. The Massachusetts ban fails any measure of heightened constitutional scrutiny.

Under *Heller*, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. In as much as Massachusetts outlaws possession of Tasers by responsible, law abiding citizens for all purposes, including for home defense, section 131 J is unconstitutional. Because section 131J bans an entire class of arms, it does not permit possession of a Taser even in the home. The ban sweeps broadly to prevent law-abiding persons from using Tasers or stun guns under any circumstances for legal self-defense.

The ban fails to satisfy strict (or for that matter, any other kind of) scrutiny, as it is not necessary to advance any compelling government interest. As the Supreme Court has explained, "strict judicial scrutiny" is required whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by those who drafted and ratified the Bill of Rights. *McDonald*, 561 U.S. at 768, 778. Indeed, the D.C. Circuit stated in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be subject to heightened scrutiny. *Heller v. District of Columbia*, 670 F.3d 1244, 1257

(D.C. Cir. 2011). *See also id.* at 1266.

Even if intermediate scrutiny were applicable, section 131J still fails. As the Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014), *see also id.* at 2542, 2548 (Scalia, J., concurring), and possess a "close fit between ends and means," *id.* at 2534 (majority opinion). Here, since the ban applies without exception to every law abiding citizen, extinguishing their right to possess an entire class of weapons for core Second Amendment purposes, section 131J lacks that close fit as a matter of law.

Even if the state could show that its Taser ban would advance public safety, narrow tailoring "demand[s] a close fit between means and ends," and forbids the government from "burden[ing] substantially more [protected conduct] than is necessary to further the government's legitimate interests." *McCullen*, 134 S. Ct. at 2534–35. Although intermediate scrutiny does not require the least restrictive means available, "the government must demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. Here, whatever legitimate public safety interest the state may have could easily be met with regulations similar to the state's existing firearms licensing schemes.

## II.    Plaintiffs have suffered and will continue to suffer irreparable harm in the absence of preliminary injunctive relief.

"It has been long established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (referring to a Fourth Amendment violation) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). *See also Melendres v. Arpaio*, 695

F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury"); *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("violations of First Amendment rights are presumed to constitute irreparable injuries"); *Planned Parenthood of Minnesota v. Citizens for Community Action*, 558 F.2d 861, 866-67 (8th Cir. 1977) (holding that the inability to exercise the constitutional right to abortion constitutes irreparable harm); 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 2013) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). Once Plaintiffs establish a high likelihood of success on the merits of a constitutional claim, irreparable harm is presumed. *See Sindicato*, 699 F.3d at 15 ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well."); *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("loss of First Amendment freedoms constitutes irreparable injury."). *See also Child Evangelism Fellowship v. Minneapolis Special School District No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012) (holding that court's error in finding that plaintiff failed to establish a high likelihood of success on the merits of First Amendment claim meant that it necessarily erred in finding that plaintiff failed to establish irreparable harm). Here, since the outright ban on electrical weapons impermissibly burdens Plaintiffs' core Second Amendment right to keep and bear arms, Plaintiffs have necessarily already suffered an irreparable injury warranting a preliminary injunction.

Moreover, no adequate remedy will be available following the conclusion of this litigation because Plaintiffs cannot put a price on the loss of their rights to engage in constitutionally protected conduct in the interim. "If the plaintiff suffers a substantial injury that

13

is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simmons*, 102 F.3d at 19.  *See also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973).

The loss of First Amendment rights is presumed to constitute irreparable harm due to the intangible nature of the benefits flowing from their exercise coupled with the fear that if those rights are not jealously guarded, the people will be deterred from exercising them in the future. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533, 548 (6th Cir. 2010); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).   Because the Second Amendment protects similarly intangible and unquantifiable interests, infringement of these rights cannot be adequately compensated by money damages, and irreparable harm is presumed here as well. *Ezell*, 651 F.3d at 699.

In *Heller*, the Supreme Court said that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," 554 U.S. at 592, precisely what Plaintiffs wish to do with Tasers or stun guns, and are prohibited from doing by the ban.  This loss cannot be remedied with an award of money damages, and Plaintiffs are not seeking such damages.  This constitutional injury is not an abstract legal proposition for the Plaintiffs:  they are entitled to exercise their Second Amendment right to keep and bear arms for lawful self-protection now.  Although Plaintiffs (or their estates) could bring an after-the-fact tort suit against an assailant and possibly win money damages, only injunctive relief against Defendant can redress the ongoing deprivation of their Second Amendment rights.  Plaintiffs are

14

therefore entitled to preliminary injunctive relief.  *See Ezell*, 651 F.3d at 698 (enjoining the City of Chicago's ban on firing ranges because "If [plaintiffs are] right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books.").

### III.   The balance of harms weighs in favor of granting the preliminary injunction.

Once the threshold factors are met, this Court must consider the balance of harms which would result from the grant or denial of preliminary relief, *i.e.*, the harm to the state if the injunction is granted, and the harm to the Plaintiffs if the injunction is denied.  *Ross-Simmons*, 102 F.3d at 15.  Again, the analysis of this factor is highly influenced by the likelihood of success factor and the fact that Plaintiffs are likely to succeed.

Here, no harm to the state, irreparable or otherwise, can result from enjoining a statute which the state has no authority to enforce.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The defendant-government] cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."); *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). There is simply no state interest in enforcing a law that is unconstitutional.  *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).  *See also Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) (a district court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right).

Even if the State could suffer some form of harm from an injunction, this harm must be given lesser weight due to the Plaintiffs' high likelihood of success on the merits. "To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success. The more foreseeable is the plaintiff's ultimate success, the less weight is to be given to the defendant's prospective loss." *SEC v. World Radio Mission, Inc.*, 544 F.3d 535, 541-42 (1st Cir. 1976) (overturning a denial of preliminary injunction). *See also Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 387 (7th Cir. 1984) ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor."). Since here, Plaintiffs' chances of success are exceedingly high, any speculative harm the state may introduce should be given very little weight. An outright ban on Tasers and stun guns does not serve the state's interest in public safety, because Tasers and stun guns are actually far less dangerous than firearms. Moreover, should the state assert harm to public safety if citizens are allowed to exercise their core Second Amendment rights, the answer was wisely already provided by the Supreme Court in *Heller*: "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636. The public policy choice of denying their residents the right to bear arms for self-defense, including Tasers and stun guns, is simply no longer available to Massachusetts or any state, and any such policy arguments are irrelevant in deciding whether to enjoin the law.

Here, as in *Ezell*, Plaintiffs are law-abiding, responsible citizens whose Second Amendment rights are entitled to full solicitude under *Heller* and *McDonald*, and it is axiomatic that a state has "no legitimate interest in enforcing an unconstitutional ordinance" against them. *KH Outdoor LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Therefore, there is little risk of error in the ruling on preliminary relief, and further judicial balancing of harms is

unnecessary. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994) ("Only if the final outcome will depend on facts presented at trial, so that there is genuine uncertainty at the preliminary-injunction stage concerning what that outcome will be, should the judge go through the balancing process that we have described.").

Most all other states permit residents to carry Tasers and stun guns for self-defense.  That fact undermines any effort by Massachusetts to demonstrate exceptional circumstances. Electrical weapons in the hands of law-abiding Massachusetts residents do not pose a unique threat to public safety in Massachusetts that does not exist in other states.

Thus here, as in *Ezell*, any harms the state may invoke are entirely speculative and in any event may be addressed by more closely tailored regulatory measures, such as prohibiting dangerous felons or the mentally ill from possessing Tasers and stun guns, rather than denying them to everyone but police.  *See Ezell*, 651 F.3d at 709-10.  On the other side of the scale, the Plaintiffs have established a strong likelihood that they are suffering violations of their core Second Amendment rights every day that the ban remains in effect.  A preliminary injunction should therefore issue.

**IV.       The public interest favors immediate injunctive relief.**

The public interest is served by granting an injunction here because the preservation of constitutional rights is always in the public interest.  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("Enforcement of an unconstitutional law is always contrary to the public interest."). *See also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted)), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751

(2014); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *G&V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).  Indeed, an injunction will *benefit* the public interest because it will prevent the state from unconstitutionally limiting Massachusetts residents from exercising their right to keep and bear arms for self-defense.  *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (public interest concerns are implicated when a constitutional right is violated "because all citizens have a stake in upholding the Constitution.").

The Plaintiffs are likely to prevail on the merits.  In the absence of preliminary relief, they will continue to suffer irreparable injury in the loss of their Second Amendment rights, if not actual physical harm.  The state's distaste for electrical weapons is not a legitimate interest, and any actual interest in protecting the public from misuse by dangerous felons or the mentally ill could be advanced through more narrowly tailored regulations.  Although an outright ban on electrical weapons may be easier for the state, "the public has no interest in saving the Government from the burdens of the Constitution," and the public's interest in respecting fundamental constitutional rights is directly served by enjoining the ban.  *Klayman v. Obama*, 957 F. Supp. 2d 1, 43 (D.D.C. Dec. 16, 2013).

## V.    Conclusion

Defendants are presently violating Plaintiffs' Second Amendment rights by enforcing Mass. Gen. Law. ch. 140 § 131J.  Immediate injunctive relief is required in order to halt the harm Plaintiffs continue to suffer every day.  Plaintiffs therefore respectfully request that this Court grant a preliminary injunction enjoining Defendants from enforcing Section 131J against them.

Respectfully submitted,


Gregory D. Cote, BBO# 553926
gcote@mccarter.com
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
617-449-6500 – o
617-326-3098 – f



/s/ Michael E. Rosman
Michael E. Rosman*
rosman@cir-usa.org
Michelle A. Scott*
scott@cir-usa.org
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave., N.W., Suite 625
Washington, D.C. 20036
202-833-8400 – o
202-833-8410 – f
*pro hac vice