UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MARTEL, DONNA MAJOR, AND LYN BATES,<br><br>                    Plaintiffs,<br><br>          v.<br><br>MAURA HEALEY, in her official capacity as Attorney General of Massachusetts,<br><br>                    Defendant. | CIVIL ACTION<br>NO. 17-cv-10248 |

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

A preliminary injunction is a "drastic and extraordinary remedy" meant to "freeze an existing situation" to prevent irreparable harm to the moving party.  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010); CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995).  Here, the plaintiffs invoke this equitable remedy not to preserve the status quo, but to suspend a statutory prohibition on electrical weapons that has existed for over three decades.  Doing so would leave this entire category of weapons unregulated, in contrast to the careful licensing scheme in place in the Commonwealth for firearms.  A motion for preliminary injunction is the wrong vehicle for affirmative relief on the merits of plaintiffs' claim, especially where they do not face irreparable harm pending full adjudication of the case.  Accordingly, the Court should deny the motion.

**STATUTORY BACKGROUND**

A Massachusetts statute, General Laws c. 140, § 131J, prohibits civilians from possessing "a portable device or weapon from which an electrical current, impulse, wave, or beam may be

directed, which current, impulse, wave, or beam is designed to incapacitate temporarily, injure, or kill."[1]  First passed in 1986, the statute originally barred all individuals from possessing these electrical weapons, including law enforcement officers.  See St. 1986, c. 212.  In 2004, the Legislature amended the statute to allow law enforcement officers and certain suppliers to possess electrical weapons.  See St. 2004, c. 170, § 1, codified at G.L. c. 140, § 131J.  Before they may do so, however, law enforcement officers must complete a training program, approved by the Executive Office of Public Safety and Security ("EOPSS"), on the appropriate use of such weapons.  Id.; see also 501 Code Mass. Regs. ("C.M.R.") 8.05–8.06.  The training program must, among other things, review the mechanics of electrical weapons; discuss the medical implications of discharging electrical weapons, particularly on persons with preexisting medical conditions; and train law enforcement officers to become proficient in discharging electrical weapons.  501 C.M.R. 8.05.

The Legislature required electrical weapons used by law enforcement officers to include "a mechanism for tracking the number of times the device or weapon has been fired."  G.L. c. 140 § 131J.  Law enforcement officers must also track "the identifying characteristics, including the race and gender, of the individuals who have been fired upon."  St. 2004, c. 170, § 2.  This data must then be compiled and analyzed in an annual report on the deployment of electrical weapons in the Commonwealth.  Id.; see, e.g., T. Edson, Exec. Office of Pub. Safety & Security, Electronic Control Weapons in Massachusetts: 2015, (Oct. 2016), available at http://www.mass.gov/eopss/docs/ogr/ecw-in-massachusetts-annual-report-2015.pdf.  The

---

[1] This definition covers both "Tasers" and "stun guns."  See Comm. v. Odimegwu, 75 Mass. App. Ct. 1110 (2009) (Rule 1:28 order) (briefly discussing the difference between the two).  For simplicity, this brief refers to "electrical weapons."

Secretary of EOPSS must distribute the report to the Attorney General's Office, the Department of the State Police, the Massachusetts Chief of Police Association, and the clerks of the House of Representatives and the Senate.  St. 2004, c. 170, § 2.

Individuals who violate Section 131J may be fined between $500 and $1000 or face six months to two and a half years in prison, or both.  Id.

## LEGAL STANDARD

A preliminary injunction is "a drastic and extraordinary remedy," Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010), "never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995); see Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").  In weighing an injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).

"To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).  The last two factors "merge when the Government is the opposing party." See Nken v. Holder, 556 U.S. 418, 435 (2009) (addressing the similar four-factor test in a motion for a stay).  "An injunction should issue only if the traditional four-factor test is satisfied,"

3

Monsanto, 561 U.S. at 157; "the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

## ARGUMENT

More than three decades after Massachusetts first prohibited the possession of electrical weapons and nearly a decade since the Supreme Court recognized a qualified individual right to bear arms, the plaintiffs ask this Court to grant an emergency request to relieve them of complying with Section 131J.  Yet the plaintiffs have failed to show that they are being irreparably harmed by Section 131J, nor can they explain why it would advance the public interest to abruptly suspend all regulation of electrical weapons.  In short, the plaintiffs cannot explain why the Court should upend the status quo to grant relief before this case has been fully adjudicated.

Furthermore, granting the plaintiffs' motion would require this Court to address the novel question of what test determines whether a weapon is an "arm" within the meaning of the Second Amendment.  And, even if it discerned the operative test, the Court could grant injunctive relief only if it concludes that electrical weapons are "arms" protected by the Second Amendment and that civilians have a constitutional right to carry these weapons, without restriction, in public places.  These determinations would find no support in the precedent guiding this Court.  Finally, ruling for the plaintiffs would suspend a presumptively valid state law long in existence, upsetting the "proper balance between state and federal authority." City of Los Angeles v. Lyons, 461 U.S. 95, 112 (1983).  The Court should decline to wade into these unsettled waters, and should deny the motion and proceed to a "full adjudication of the case's merits." CMM Cable, 48 F.3d at 620.

**I.      The Plaintiffs Cannot Establish That Section 131J Threatens Irreparable Harm.**

The plaintiffs cannot show that they are irreparably harmed by a prohibition on electrical weapons that has existed for 31 years.  Irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction."  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1, at 139 (3d ed. 2016) (quoted in Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 35 (1st Cir. 2011)).  A mere "possibility of irreparable harm" is insufficient, see Winter, 555 U.S. at 22; "only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined."  Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 74 (1st Cir. 1981).

Additionally, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights."  Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).  As a result, "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  Voice of the Arab World, 645 F.3d at 35.  Here, the plaintiffs waited six weeks after filing their complaint to seek a preliminary injunction.  "That chronology has evidentiary significance: delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."  Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004).  As a result, the plaintiffs' "cries of urgency are sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief."  Id.

The plaintiffs nonetheless argue that any "loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[2] Doc. No. 11-1 at 13 (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). But this argument assumes that the statute impairs a constitutional right – and that is, in fact, the contested question at the heart of the case. In Mills, which challenged a police checkpoint program, the Court observed that "harm to the rights of appellants is apparent" because "citizens have a right to drive upon the public streets . . . absent a constitutionally sound reason for limiting their access." 571 F.3d at 1312. There, the harm was "apparent" because the right asserted – driving on public streets – was well established. Here, by contrast, harm is far from "apparent" because the plaintiffs assert a novel right beyond any established by our courts.

In addition, the plaintiffs cannot establish irreparable harm by relying, as they do, on cases involving alleged violations of First Amendment rights. "While certain constitutional violations are more likely to bring about irreparable harm, we have generally reserved this status for infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 484–85 (1st Cir. 2009) (internal quotations omitted). And even for these infringements, "the fact that [the plaintiff] is asserting First Amendment rights does not automatically require a finding of irreparable injury." Rushia v. Town of Ashburnham, 701 F.2d 7, 10 (1st Cir. 1983). Rather, "every case depends on its own

---

[2] This modified quotation is taken from Elrod v. Burns, 427 U.S. 347, 373 (1976). But Elrod stated that "[t]he loss of *First Amendment* freedoms . . . constitutes irreparable injury," not *any* constitutional freedoms. Id. (emphasis added). Subsequent First Circuit cases have cited Elrod only for that more limited proposition. See, e.g., Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10–11 (1st Cir. 2012); Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla, 490 F.3d 1, 21 (1st Cir. 2007).

6

facts." Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010) (denying request for an injunction pending appeal because plaintiffs "[had] not shown any immediate injury that requires issuance of an emergency injunction, putting aside their claim that Maine's laws burden their speech in contravention of the First Amendment").

In fact, the First Circuit has explicitly declined to extend its more expansive approach under the First Amendment to a Second Amendment claim. In Hightower v. City of Boston, 693 F.3d 61, 72 (1st Cir. 2012), the court rejected a Second Amendment challenge to the Commonwealth's firearms licensing scheme, noting that the plaintiff's invocation of First Amendment doctrines was "a poor analogy." 693 F.3d at 79–81. For that reason, the Court refused to apply prior restraint and overbreadth doctrines that it concluded were "particular to the First Amendment." Id. at 80. And in a different case weighing irreparable harm, the First Circuit rejected a comparison between the First Amendment and procedural due process. Pub. Serv. Co. of New Hampshire v. Town of W. Newbury, 835 F.2d 380, 382 (1st Cir. 1987). In short, the plaintiffs are not entitled to a presumption of irreparable harm simply because they invoke a constitutional right.

Ultimately, even the plaintiffs' own statements show that they have suffered no irreparable harm. The plaintiffs claim that they urgently need electrical weapons to use in self-defense. See Doc. Nos. 11-2, 11-3, 11-4. Yet two of the three plaintiffs admit that they already possess licenses to carry firearms. Doc. Nos. 11-2, 11-3. A third plaintiff, Donna Major, states that she cannot contemplate the circumstances under which she would use a firearm and seeks an electrical weapon as an alternative means of self-defense. Doc. No. 11-4. Yet Ms. Major already has access to such alternative means: she can purchase pepper spray, a device expressly "designed to disable a suspect without causing permanent physical injury." Vinyard v. Wilson,

7

311 F.3d 1340, 1348 (11th Cir. 2002). Indeed, pepper spray can be purchased without a license in Massachusetts. See G.L. c. 144, § 122D. These alternatives to electrical weapons leave the plaintiffs with capable means of defending themselves. As a result, Section 131J does not cause them irreparable harm.

## II. The Plaintiffs' Claim Raises Unresolved Constitutional Questions That Should Only Be Addressed Upon Full Consideration of the Merits.

On the merits, the plaintiffs seek rulings on two unresolved constitutional questions: whether electrical weapons are "arms" under the Second Amendment and, if so, whether the Commonwealth may lawfully prohibit them after District of Columbia v. Heller, 554 U.S. 570 (2008), which recognized an individual right to possess a handgun in the home for self-defense. Yet the answer to these questions is far from clear. In fact, the First Circuit has yet to discuss the application of the Second Amendment to electrical weapons and the Supreme Court in 2016 did not address whether electrical weapons receive constitutional protection. See Caetano v. Massachusetts, 136 S. Ct. 1027 (2016) (per curiam). Given this unsettled landscape, the Court should "refrain from resolving novel and difficult constitutional questions, leaving them to be settled at a later stage, with the benefit of further factual and legal development." Gordon v. Holder, 721 F.3d 638, 644 (D.C. Cir. 2013).

In Heller, the Court held that the Second Amendment provides a qualified individual right to keep and bear arms under which the District of Columbia could not prohibit citizens from keeping an operable handgun for defense of "hearth and home." Heller, 554 U.S. at 635. For its part, the First Circuit has read Heller "narrow[ly]," upholding every restriction on gun possession that has come before it. See, e.g., Powell v. Tompkins, 783 F.3d 332, 344-49 (1st Cir. 2015) (upholding minimum age qualifications in firearms licensing regulations, among other things); Hightower, 693 F.3d at 73 (concealed carry licensing); United States v. Booker, 644

F.3d 12, 22 (1st Cir. 2011) (restrictions on gun possession by perpetrators of domestic violence); United States v. Rene E., 583 F.3d 8, 12 (1st Cir. 2009) (restrictions on gun possession by juveniles). In Hightower, the court expressly declined to expand Heller's core holding: "we should not engage in answering the question of how Heller applies to possession of firearms outside of the home . . . the whole matter is a vast *terra incognita* that courts should enter only upon necessity and only then by small degree." 693 F.3d at 74 (quoting Judge Wilkinson's concurrence in Masciandaro, 638 F.3d at 475) (internal quotations omitted).

Still, the plaintiffs argue that the 2016 Caetano decision made clear that a law prohibiting electrical weapons is unconstitutional. But Caetano did no such thing. Setting aside Justice Alito's concurrence, which garnered only two votes, Caetano merely held that the Supreme Judicial Court applied the wrong reasoning in upholding Section 131J. See 136 S. Ct. at 1027–28. The Court explained that the SJC was wrong to consider whether electrical weapons "were in common use at the time of the Second Amendment's enactment" as indicative of whether the Second Amendment extends to such weapons. Similarly, the SJC incorrectly concluded that electrical weapons were "unusual" because they were "a thoroughly modern invention." Id. at 1027–28. But the Caetano court did not hold that electrical weapons are "arms" protected by the Second Amendment; did not say that Section 131J is invalid; and did not explain what test the SJC should use to evaluate that question. See id. at 1027–28; 1033 (Justice Alito decrying the Court's "grudging *per curiam*"). Indeed, although given the opportunity to make a broader ruling, the Caetano court offered no more, and sent the case back to the SJC for further proceedings.[3]

---

[3] Defendant Jaime Caetano's conviction for stun gun possession was subsequently vacated and the SJC did not issue another ruling.

9

After Caetano, a robust argument remains that electrical weapons fall outside the Second Amendment's reach. Although the First Circuit has not yet addressed how to determine which weapons are protected by the Second Amendment, other Circuits have. In Parker v. District of Columbia, the D.C. Circuit inquired whether present-day weapons were "lineal descendant[s]" of weapons in existence at the time the Second Amendment was ratified, and thus protected. 478 F.3d 370, 398 (D.C. Cir. 2007), aff'd, Heller, 554 U.S. 570. Similarly, the Seventh Circuit asks, among other things, whether a present-day weapon bears "features" that were "common at the time of ratification." Friedman v. City of Highland Park, Illinois, 784 F.3d 406, 410 (7th Cir. 2015) (citing Heller, 554 U.S. at 622–25). The plaintiffs cannot plausibly argue that electrical weapons are "lineal descendants" of weapons in common use when the Second Amendment was ratified. And the weapons available to colonial militiamen did not have features that were precursors of those in present-day electrical weapons, which are wholly different. For example, electrical weapons do not discharge rounds, do not need to be reloaded, injure without leaving a physical trace on their victims, and, most conspicuously, deploy electricity to incapacitate their target. As a result, electrical weapons remain outside the Second Amendment's reach.

Additionally, even if electrical weapons received Second Amendment protection, the plaintiffs have not established that they have a right to carry these weapons without restriction in public places, rather than only in the home for self-defense. The First Circuit has declined "to hold that the limited Second Amendment right as articulated in Heller extends outside the vicinity of the home." Powell, 783 F.3d at 348. Rather, a right to "carry[] concealed weapons outside the home is distinct from [the] core interest emphasized in Heller." Hightower, 693 F.3d at 72 ("We do not reach the issue of the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home."). And other

courts have cautioned against reading Heller to extend beyond the home.  See United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., concurring) ("There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions.").  As a result, the plaintiffs are wrong to argue that the Commonwealth must allow civilians to carry electrical weapons in public places.

Ultimately, the plaintiffs, not the Commonwealth, bear the burden of showing a likelihood of success on the merits.  A "mere possibility" of success will not do; the plaintiffs must establish a "strong likelihood" that they will ultimately prevail.  Sindicato Puertorriqueno de Trabajadores, 699 F.3d at 10 (citing Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).  And they have not done so here.

**III.   A Preliminary Injunction Would Be Detrimental to the Public Interest.**

Finally, an injunction would harm the public interest by preventing enforcement of a law passed by the people's elected representatives to promote public safety.  It is well settled that "[e]very rational presumption is indulged in favor of the validity of an act of the General Court." Klein v. Catalano, 386 Mass. 701, 706–07 (1982).  Accordingly, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  Maryland v. King, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers).

Enjoining Section 131J would inflict such injury on the public.  The Legislature enacted Section 131J to promote public safety.  Indeed, the Legislature was concerned enough about the safety of electrical weapons that it initially prohibited everyone, including law enforcement officers, from possessing those weapons.  See St. 1986, c. 212.  And even when the Legislature

authorized law enforcement officers to possess electrical weapons, see St. 2004, c. 170, § 1, it ensured that the officers would receive training on the safe and accurate deployment of the weapons, and required law enforcement agencies to compile data on the weapons.  See G.L. c. 140, § 131J; St. 2004, c. 170, § 2.  Granting a preliminary injunction would upend that careful legislative judgment. Even if there is an ongoing policy debate about whether electrical weapons should be made available to civilians, there is likely no disagreement that there should be a regulatory scheme in place to limit access to law-abiding, responsible citizens and to promote safe and responsible use.[4]  But if the Court enjoined enforcement of Section 131J, as the plaintiffs request, these devices would be available without regulation.  In the circumstances, such decisions should be made by the Commonwealth's political branches, not the courts.  See Kolbe v. Hogan, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) ("[C]ourts must not "arrogate to themselves decisions that have been historically assigned to other, more democratic, actors."); see also Sebelius, 132 S. Ct. at 2579 ("Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments.").

Granting an injunction would also raise federalism concerns.  Federal courts must "recognize the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  Lyons, 461 U.S. at 112 (citing O'Shea v.

---

[4] The risks and dangers of electrical weapons are widely acknowledged.  See, e.g., United States v. Agron, 921 F.2d 25, 26 (2d Cir. 1990) (per curiam); United States v. Wallace, 800 F.2d 1509, 1513 (9th Cir. 1986); State v. Geier, 484 N.W.2d 167, 171–72 (Iowa 1992); People v. MacCary, 173 A.D.2d 646, 647 (N.Y. App. Div. 1991).  So too are examples of the improper use of these weapons.  See, e.g., Thomas v. Nugent, 539 Fed. Appx. 456 (5th Cir. 2013), vacated and remanded, 134 S. Ct. 2289 (2014); Fontenot v. Taser Int'l, Inc., 736 F.3d 318 (4th Cir. 2013); Russell v. Wright, 916 F. Supp. 2d 629 (W.D. Va. 2013); Lee v. Metropolitan Govt. of Nashville & Davidson County, 596 F. Supp. 2d 1101 (M.D. Tenn. 2009); Neal-Lomax v. Las Vegas Metropolitan Police Dept., 574 F. Supp. 2d 1170 (D. Nev. 2008); MacCary, 173 A.D.2d 646.

Littleton, 414 U.S. 488, 499 (1974); Younger v. Harris, 401 U.S. 37, 46 (1971)).  Accordingly, courts must show "restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws," which is exactly the case here.  Id.  Indeed, several courts weighing Second Amendment challenges have counseled against "[d]isenfranching the American people" on the sensitive issue of firearms regulation.  See Kolbe, 849 F.3d at 150 (Wilkinson, J., concurring) ("Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps."); Friedman, 784 F.3d at 412 ("The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process.").

## CONCLUSION

The plaintiffs' motion for a preliminary injunction should be denied.

> Respectfully submitted,
>
> MAURA HEALEY
> ATTORNEY GENERAL
>
> /s/ William W. Porter
> William W. Porter, BBO# 542207
> Andrew J. Haile, BBO# 694182
> Assistant Attorneys General
> Government Bureau
> One Ashburton Place
> Boston, MA  02108
> (617) 963-2976
> Bill.Porter@state.ma.us

Date: April 27, 2017

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on April 27, 2017.

> /s/ William W. Porter
> William W. Porter
> Assistant Attorney General