UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER MARTEL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:17-cv-10248 |
| MAURA HEALEY, in her Official Capacity as | ) | |
| Attorney General of the Commonwealth of | ) | |
| Massachusetts, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF PLAINTIFFS'**

**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit this memorandum of law, along with their accompanying statements and their statement of material facts in support of their motion for summary judgment.

## INTRODUCTION

A Taser is a conducted electrical weapon that shoots two wired probes into the skin of the target using a compressed nitrogen gas propellant.  The probes then emit an electrical pulse lasting a few seconds that causes involuntary muscle contractions and temporarily impairs motor skills or involuntary immobilization.  *See* https://help.buy.taser.com/hc/en-us/articles/220814407-How-does-a-TASER-work-.  A stun gun emits a similar electrical charge, but requires closer contact as the device itself (rather than the probes) must make contact with the target's skin.  Mass. Gen. Law. ch. 140 § 131J establishes an absolute ban on the possession, sale, or use of all electrical weapons, even in the home, including Tasers or stun guns, with exceptions only for certain law enforcement officers acting in the course of their official duties and dealers selling to law enforcement.  Section 131J states, "No person shall possess a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill."  Section 131J also prohibits the sale of electrical weapons to anyone other than law enforcement agencies.  The penalty for violation of section 131J is a fine ranging from $500 to $1000, imprisonment from six months to two and one half years, or both.

Plaintiffs are all residents of Massachusetts.  *See* Exhibits 1-3.  Plaintiffs Martel and Bates are licensed to carry concealed firearms in the state of Massachusetts and have extensive training in firearms and self-defense.  *See* Exhibits 1-2.  Plaintiff Major has moral objections to using firearms even in self-defense.  *See* Exhibit 3.  Based upon Plaintiffs' training and experience, Plaintiffs each believe there are certain situations in which they would prefer to carry

a Taser or stun gun in lieu of a more deadly firearm for self-defense purposes.  Plaintiffs wish to

purchase and possess Tasers or stun guns for lawful self-defense purposes and would do so but

for their fear of prosecution, fines, and imprisonment under Section 131J.  Defendant's

enforcement of Section 131J therefore violates Plaintiffs' Second Amendment rights (as

incorporated into the Fourteenth Amendment).  Plaintiffs filed this lawsuit to challenge this

unconstitutional practice and now seek summary judgment in their favor, a declaratory judgment

that Section 131J violates the Second and Fourteenth Amendments to the United States

Constitution and 42 U.S.C. § 1983; and a permanent injunction barring Defendant from

enforcing Section 131J against them.

## ARGUMENT

The Second Amendment to the United States Constitution protects the right to keep and

bear arms including non-lethal arms such as Tasers and stun guns, and Massachusetts' complete

ban on the possession and sale of electrical weapons violates this right.  Plaintiffs--all law-

abiding residents of Massachusetts--have suffered and continue to suffer injury from the ban, as

they are prevented from exercising their core right of self-defense as identified in *District of

Columbia v Heller*, 554 U.S. 570 (2008), under the Second Amendment.  The Commonwealth of

Massachusetts has no valid interest sufficient to support a blanket ban of an entire class of non-

lethal weapons from use for self-defense by law-abiding residents.

### I.     Electrical weapons are arms under the Second Amendment.

The Second Amendment on its face protects the "right to keep and bear *Arms*," not

simply the right to keep and bear *guns* or *firearms*. U.S. Const., Am. II (emphasis added).

Because electrical weapons are "arms," their possession is protected by the Second Amendment.

Defendant cannot justify denying Plaintiffs their right to possess them.

2

In *District of Columbia v Heller*, 554 U.S. 570, 581 (2008), the Supreme Court explained the term "arms":

> The 18th-century meaning is no different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence."  Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."

(citations omitted).  Four more times during the course of examining the phrase "keep and bear arms" in *Heller*, the Court expressly referred to weapons other than firearms as "arms."  *Id.* at 581–92.

First, when explaining that "keep and bear arms" includes civilians possessing arms for self-defense, the Court referred to the aforementioned Cunningham legal dictionary,  which provided that "'Servants and labourers shall use bows and arrows on *Sundays, . . .*  and not bear other arms.'"  *Id.* at 581 (emphasis original, citation omitted).  The phrase "*other* arms" (emphasis added) obviously meant that the dictionary understood bows and arrows to be arms.  Accordingly, this reference would have been pointless—indeed, counter-productive—if the Court limited the definition of "arms" to firearms.

Later in that same section, the Court explained that various "legal sources frequently used 'bear arms' in nonmilitary contexts," and cited examples, one being the earlier dictionary quote referencing bows and arrows*, id.* at 587–88, and the other quoting a scholar:  "Since custom has allowed persons of rank and gentlemen of the army to bear arms in time of peace, strict care should be taken that none but these should be allowed to wear swords."  *Id.* at 587 n.10 (quoting E. de Vattel, *The Law of Nations, or, Principles of the Law of Nature* 144 (1792)).  Both times the source (and thus, the Court) treated the word "arms" as including other weapons.

Later, responding to the dissent, the Court mentioned knives as "arms."  The dissent pointed to an earlier proposed version of the Second Amendment that included a conscientious-objector provision in support of its view that the right to bear arms was limited to service in the military.  The majority disagreed:

> [The deleted provision] was not meant to exempt from military service those who objected to going to war but had no scruples about personal gunfights. Quakers opposed the use of *arms* not just for militia service, but for any violent purpose whatsoever—so much so that Quaker frontiersmen were forbidden to use *arms* to defend their families, even though "[i]n such circumstances the temptation to seize a hunting rifle or *knife* in self-defense ... must sometimes have been almost overwhelming."

*Id.* at 590 (emphasis added) (citation omitted). The Court thus included knives alongside rifles as examples of "arms" for Second Amendment purposes.

Of course, *Heller* speaks mostly about guns because the plaintiff in *Heller* challenged an absolute ban on handguns.  But, the Court's extensive references to other weapons, show that Second Amendment rights are not limited to firearms.  Tasers and stun guns—easily carried for self-defense—constitute arms under the Second Amendment.  And the Court in *Heller* concluded that the Second Amendment codifies a preexisting "individual right to possess and carry *weapons* in case of confrontation."  *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added).  Later, in *McDonald v. Chicago*, 561 U.S. 742, 778 (2010), the Court incorporated this right against the states through the Fourteenth Amendment.

Many state courts have found weapons other than firearms protected under the Second Amendment.  For instance, the Connecticut Supreme Court applied *Heller* to invalidate a statute criminalizing the transport of dirk knives and police batons in a motor vehicle.  *State v. DeCiccio*, 105 A.3d 165, 185-210 (Conn. 2014).  *See also State v. Griffin*, 2011 WL 2083893, *7

n.62 (Del. Super. Ct. May 16, 2011) (holding that "arms" encompasses "all instruments that constitute bearable arms" and therefore a "knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes," and is protected under the Second Amendment); *City of Akron v. Rasdan*, 663 N.E.2d 947, 951-52 (Ohio Ct. App. 1995) (treating a restriction on knife possession as implicating the "right to keep and bear arms" under the Ohio Constitution, though concluding that the restriction is constitutional because "[t]he city of Akron properly considered this fundamental right by including in [the knife restriction] an exception from criminal liability when a person is 'engaged in a lawful business, calling, employment, or occupation' and the circumstances justify 'a prudent man in possessing such a weapon for the defense of his person or family'"); *State v. Delgado*, 692 P.2d 610, 610-14 (Or. 1984) (holding that the "right to keep and bear arms" under the Oregon Constitution extends to switch blade knives because they could be used for defensive purposes).

More recently, the Supreme Court unanimously reversed the Massachusetts Supreme Judicial Court's holding that stun guns were not protected arms because they were not in common use when the Second Amendment was enacted and because the record lacked evidence that they were readily adapted to military use. *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016). The Supreme Court explained that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Id.* at 1027 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Of course, Tasers and stun guns were unknown when the Second Amendment was enacted, but *Heller* expressly rejected the view "that only those arms in existence in the 18th century are protected by the Second Amendment." *Heller*, 554 U.S. at 582. Instead, the Court held, "[j]ust as the First Amendment protects modern forms of communications [such as the Internet], and the

Fourth Amendment applies to modern forms of search [such as heat detection devices], the

Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even

those that were not in existence at the time of the founding." *Id.* (citations omitted).  The Court

also rejected the "proposition 'that only those weapons useful in warfare are protected.'"

*Caetano*, 136 S. Ct. at 1028, quoting *Heller*, 554 U.S. at 624-25.

Furthermore, Tasers and stun guns in particular share many characteristics with the

handguns at issue in *Heller.*    They are small and light and thus easily carried.  And, like the

modern handgun, a Taser or stun gun is small enough that it may be kept in a location like a

purse "that is readily accessible in an emergency," and it may be preferred by "those without the

upper-body strength to lift and aim" a heavier weapon.  *Heller*, 554 U.S. at 629.   The first Taser

was actually named for a rifle—Taser was an acronym for "Thomas Swift Electric Air Rifle," a

favorite science fiction novel of its inventor, Jack Cover.  *See*

www.nytimes.com/2009/02/16/us/16cover.html  The original Tasers actually used gunpowder as

a propellant rather than the compressed nitrogen now used and was thus regulated as a firearm by

the Bureau of Alcohol Tobacco and Firearms.  *See*

https://www.thestar.com/news/2007/12/01/the_dark_lure_of_pain_compliance.html

II.    **Electrical weapons are neither "dangerous" nor "unusual," and thus do not fall under the exceptions laid out in Heller.**

a.   **Tasers and stun guns are in common use for Second Amendment purposes.**

While the Supreme Court in *Heller* recognized certain limits to the right to keep and bear

arms, none of those are applicable here.  First, the Court noted that the Second Amendment does

not extend to weapons "not typically possessed by law-abiding citizens for lawful purposes."

*Heller*, 554 U.S. at 625.  The Court also noted that "the sorts of weapons protected were those 'in common use.'" *Id.* at 627 (citation omitted).

Tasers and stun guns were, of course, not in common use at the time of the Second Amendment's enactment because they did not yet exist. But the Supreme Court "do[es] not interpret constitutional rights that way."  *Heller*, 554 U.S. at 582.  *See also Caetano*, 136 S. Ct. at 1028.   Use of electronic weapons are now widespread in the United States.  *See People v. Yanna*, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012) ("[h]undreds of thousands of (them) have been sold to private citizens, with many more in use by law enforcement officers."); Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 Stan. L. Rev. 199, 244 (2009); Taser State Requirements *https://buy.taser.com/taser-state-requirements/*. (Tasers and stun guns are currently restricted in only New York, Hawaii, Rhode Island, Massachusetts, and a few municipalities).  Possession of electrical weapons by otherwise law-abiding citizens is legal for civilians in 45 states and Tasers are routinely used by nearly 94 percent of American police departments.  *See* Hardy, *Taser's Latest Police Weapon:  The Tiny Camera and the Cloud*, N.Y. Times, February 21, 2012 (available at http://www.nytimes.com/2012/02/21/technology/tasers-latest-police-weapon-the-tiny-camera-and-the-cloud.html?_r=0&pagewanted=print); Volokh, *Nonlethal Self-Defense*, 62 Stan. L. Rev. at 244.

Recently, the Fifth Circuit cited approvingly to *Caetano* for the proposition that stun guns are in common use for purposes of the Second Amendment:

> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns

are widely owned and accepted as a legitimate means of self-defense across the country.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (quoting *Caetano*, 136 S. Ct. at 1032–33 (citations and quotation marks omitted)).

Although Tasers did not exist in 1789, other portable self-defense weapons less lethal than firearms, such as knives and billy clubs, were in common use at the founding and they were protected by the Second Amendment. *See State v. DeCiccio*, 105 A.3d at 190-191. Tasers thus share many of the features that make handguns so popular as self-defense arms, but with one important exception relevant here—they are far less likely to be lethal. The conclusion that Tasers and stun guns are arms under the Second Amendment is thus obvious.

**b. Tasers are not dangerous and unusual.**

*Heller* also acknowledged "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 625 (citation omitted). Thus, "dangerous and unusual" weapons are historically excluded from the scope of the right, but this exception, by the Court's own words, is indeed limited to weapons that are not only "unusual" but also "dangerous." Moreover, because all weapons are "dangerous" to some degree, the reference to "dangerous . . . weapons" must mean weapons that are more dangerous than the norm—logically meaning weapons that are unusually dangerous.

Whatever else might fall under that description, electrical weapons are not unusually dangerous weapons. They are significantly less deadly than firearms, which are constitutionally protected and broadly allowed in Massachusetts. They are less dangerous even than knives, clubs, baseball bats, or bare hands and fists. *See Caldwell v Moore*, 968 F.2d 595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less

dangerous for all involved than a hand to hand confrontation"). To be sure, all attacks have the potential to turn deadly: pushing or hitting back at an attacker could cause him to fall the wrong way and die. But Tasers and stun guns are so rarely deadly that they merit classification as non-deadly force, much closer to a punch or a shove than a gun shot. Since the *Heller* Court concluded that handguns are not sufficiently dangerous to fall outside Second Amendment protection, then certainly, less dangerous electrical weapons are protected as well.

Likewise, though Tasers and stun guns can be used for crimes as well as for legitimate self-defense, that is true of any weapon. The best estimates show that deliberate uses of Tasers are deadly in less than 0.01% of all cases, as compared to an estimated 20% death rate from gunshot wounds in deliberate assaults, and an estimated 2% death rate from knife wounds in deliberate assaults. Volokh*, supra*, 62 Stan. L. Rev. at 205. A recent three-year study of over 1200 Taser deployments by police resulted in 99.75% of subjects suffering either mild injuries such as a superficial puncture wound from the probe, or no injury at all, with no deaths attributable to the conducted electrical weapons. William P. Bozeman, et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects*, 53 Annals of Emergency Medicine 480, 480 (2009). Likewise, the United States Department of Justice found that the risk of moderate or severe injury or death from exposure to an electrical weapon is "probably less than one percent." United States Department of Justice, Office of Justice Programs, *Study of Deaths Following Electro Muscular Disruption*, at 6 (May 2011) available at https://www.ncjrs.gov/pdffiles1/nij/233432.pdf. This is why Tasers and stun guns are referred to as "nonlethal weapons." *See* Volokh, *supra*, 62 Stan. L. Rev. at 238. Private arms ownership always poses some risks, but our nation's founders agreed that the people are entitled to keep and bear arms *despite* the risk that some people will abuse them. If

that is true for deadly weapons like handguns, it is *especially* true for weapons that are almost entirely nonlethal, including Tasers and stun guns.

### III.   Following *Heller*, and *Caetano*, other jurisdictions with similar bans have recognized their invalidity and many have declined to defend them.

Since *Heller* and *Caetano*, most of the remaining jurisdictions with outright bans on Tasers and stun guns have recognized that prohibiting law-abiding residents from choosing a Taser or stun gun for self-defense is clearly unconstitutional.  Accordingly, in the past few months, four different state and local governments have recognized that their outright bans on electrical weapons do not pass constitutional muster, and have therefore declined to defend them when challenged in litigation.  Recognizing the futility of defending their bans, the District of Columbia, the city of New Orleans, and the city of Annapolis have sought stays during the litigation and promptly enacted new more limited regulations and/or agreed not to enforce the bans against the named plaintiffs while new legislation is pending.  *See* Exhibit 4, *Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); Exhibit 5, *Ford v. City of New Orleans*, No. 2:16-cv-16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20  (stipulating that the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that decriminalized possession of stun guns); Exhibit 6, *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the court that the City Council passed an emergency ordinance eliminating all restrictions on ownership and possession of electronic weapons for personal defense).

Recently, the Attorney General for New Jersey entered into a consent order agreeing that New Jersey's ban was unconstitutional, stating that

> Pursuant to the holdings in Heller, McDonald and Caetano, N.J. Stat. Ann . §
> 2C:39- 3(h), to the extent this statute outright prohibits, under criminal penalty,
> individuals from possessing electronic arms, is declared unconstitutional in that it
> violates the Second Amendment to the United States Constitution and shall not be
> enforced.

Exhibit 7, *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. Nov. 16, 2016) Doc. No. 30, at 4 (permitting a stay of 180 days in order to implement laws, rules, or regulations to impose reasonable limitations on the carrying of electronic arms consistent with public safety and the Second Amendment).

Even before *Caetano*, the Michigan Court of Appeals recognized that, following *Heller*, the Second Amendment "protect[s] a citizen's right to possess and carry Tasers or stun guns for self-defense, and the state may not completely prohibit their use by private citizens." *People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons).

## IV.    The Massachusetts ban likewise fails any measure of heightened constitutional scrutiny.

Plaintiffs are residents of Massachusetts who wish to purchase and possess electrical weapons for lawful self-defense purposes.  Section 131J prohibits this activity even in the home, where the core right of self-defense under the Second Amendment is at its strongest.  Defendant actively enforces Section 131J.  Plaintiffs, all law-abiding residents of Massachusetts, would purchase and carry Tasers or stun guns for lawful self-defense, but that they fear arrest and prosecution for violating Section 131J.  *See* Exhibits 1-3.  Plaintiffs Martel and Bates are already licensed to carry concealed firearms in Massachusetts.  Exhibits 1-2. Section 131J is the only

11

thing preventing them from purchasing and carrying a Taser or stun gun, a far less deadly weapon.  All Plaintiffs plainly have standing to challenge Massachusetts' infringement of their Second Amendment rights.

Under *Heller*, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Heller*, 554 U.S. at 635.  In as much as Massachusetts outlaws possession of Tasers and stun guns by responsible, law-abiding citizens for all purposes, including for home defense, section 131 J is unconstitutional.  Because section 131J bans an entire class of arms, it does not permit possession of a Taser even in the home.  The ban sweeps broadly to prevent law-abiding persons from using Tasers or stun guns under any circumstances for legal self-defense.

The ban fails to satisfy strict (or for that matter, any other kind of) scrutiny, as it is not necessary to advance any compelling government interest.  As the Supreme Court has explained, "strict judicial scrutiny" is required whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).  And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by those who drafted and ratified the Bill of Rights.  *McDonald*, 561 U.S. at 768, 778.  Indeed, the D.C. Circuit stated in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be subject to heightened scrutiny.  *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011).  *See also id.* at 1266.

Even if intermediate scrutiny were applicable, section 131J still fails. As the Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of constitutionally

12

protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014),

*see also id.* at 2542, 2548 (Scalia, J., concurring), and possess a "close fit between ends and

means," *id*. at 2534 (majority opinion).  Here, since the ban applies without exception to every

law-abiding citizen, extinguishing their right to possess an entire class of weapons even for core

Second Amendment purposes, section 131J lacks that close fit as a matter of law.

Even if the state could show that some Taser ban would advance public safety, narrow

tailoring "demand[s] a close fit between means and ends," and forbids the government from

"burden[ing] substantially more [protected conduct] than is necessary to further the

government's legitimate interests."  *McCullen*, 134 S. Ct. at 2534–35.  Although intermediate

scrutiny does not require the least restrictive means available, "the government must demonstrate

that alternative measures that burden substantially less [protected conduct] would fail to achieve

the government's interests, not simply that the chosen route is easier." *Id*. at 2540.  Here,

whatever legitimate public safety interest the state may have could easily be met with regulations

similar to the state's existing firearms licensing schemes.

Moreover, a categorical outright ban on Tasers and stun guns fails to serve the state's

interest in public safety, because Tasers and stun guns are actually far less dangerous than

firearms. Moreover, should the state assert harm to public safety if citizens are allowed to

exercise their core Second Amendment rights using non-deadly weapons, the answer was wisely

already provided by the Supreme Court in *Heller*:  "the enshrinement of constitutional rights

necessarily takes certain policy choices off the table."  554 U.S. at 636.  The public policy choice

of denying their residents the right to bear arms for self-defense, including Tasers and stun guns,

is simply no longer available to Massachusetts or any state, and any such policy arguments are

irrelevant in deciding whether to enjoin the law.  Here, Plaintiffs are law-abiding, responsible

citizens whose Second Amendment rights are entitled to full solicitude under *Heller* and

*McDonald*, and it is axiomatic that a state has "no legitimate interest in enforcing an

unconstitutional ordinance" against them.  *KH Outdoor LLC v. Trussville*, 458 F.3d 1261, 1272

(11th Cir. 2006).

Most all other states permit residents to carry Tasers and stun guns for self-defense.  That

fact alone undermines any effort by Massachusetts to demonstrate exceptional circumstances.

Electrical weapons in the hands of law-abiding Massachusetts residents do not pose a unique

threat to public safety in Massachusetts that does not exist in other states.

Thus here, any harms the state may invoke are entirely speculative and in any event may

be addressed by more closely tailored regulatory measures, such as prohibiting dangerous felons

or the mentally ill from possessing Tasers and stun guns, much like firearms, rather than denying

them to everyone but police.  *See Ezell v. City of Chicago*, 651 F.3d 684, 709-10 (7th Cir. 2011)

(enjoining Chicago's ban on practice ranges).  Moreover, since Plaintiffs Martel and Bates

already have Class A licenses and are permitted to carry concealed firearms, it seems the state's

interest in banning their use of a less deadly weapon is necessarily nil.  This Court need not reach

the question whether a narrower restriction might be constitutional.  Section 131J is a categorical

ban on all possession of Tasers and stun guns and as such is unconstitutional.  Whether a ban on

carrying Tasers and stun guns in public or in a sensitive place would be constitutional must await

the enactment of such a law.

## V.      Plaintiffs are entitled to declaratory and injunctive relief.

Because Section 131J is clearly unconstitutional, Plaintiffs are entitled to both declaratory

and injunctive relief.  A declaratory judgment is appropriate where it will "serve a useful purpose

in clarifying the legal relations in issue or terminate and afford relief from the uncertainty,

insecurity, and controversy giving rise to the proceeding." *Auburn Police Union v. Tierney*, 756 F. Supp. 610, 619 (D. Maine 1991) (issuing a declaratory judgment that a restriction on speech by law enforcement officers was unconstitutional, stating that "[a] declaration of the invalidity of section 3702 will not only end these parties' dispute but also properly challenge the State to rethink the mechanisms by which it might pursue its legitimate goal of protecting the integrity of law enforcement.").

Plaintiffs are also entitled to an injunction prohibiting defendant from enforcing Section 131J. *See Ex Parte Parte Young*, 209 U.S. 123, 159-60 (1908). In the First Circuit, a plaintiff must demonstrate the following three elements in order to qualify for permanent injunctive relief: (1) direct injury; (2) success on the merits; and (3) continuing irreparable injury for which there is no adequate remedy at law. *Lopez. v. Garriga*, 917 F.2d 63, 67-68 (1st Cir. 1990). Plaintiffs have satisfied all three requirements. First, Plaintiffs--all law-abiding citizens--have plainly demonstrated direct injury, since Defendant's enforcement of Section 131J is the only thing standing between them and their possessing a Taser or stun gun for lawful self-defense purposes. Next, once this Court enters summary judgment in favor of the Plaintiffs, they will have achieved success on the merits. And lastly, anything less than a permanent injunction would result in the continuation of Plaintiffs' injuries. "It has been long established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (referring to a Fourth Amendment violation) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). *See also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury"); *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("violations of First Amendment

15

rights are presumed to constitute irreparable injuries"); *Planned Parenthood of Minnesota v. Citizens for Community Action*, 558 F.2d 861, 866-67 (8th Cir. 1977) (holding that the inability to exercise the constitutional right to abortion constitutes irreparable harm); 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 2013) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary.").  Here, no monetary damages are available because the state has immunity under the Eleventh Amendment.  *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  Moreover, even if damages were available, Plaintiffs could not put a price on the loss of their rights to engage in constitutionally protected conduct.  "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."  *Ross-Simmons v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).  *See also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973).

In *Heller*, the Supreme Court said that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," 554 U.S. at 592, precisely what Plaintiffs wish to do with Tasers or stun guns, and are prohibited from doing by the ban.  This loss cannot be remedied with an award of money damages, and Plaintiffs are not seeking such damages.  This constitutional injury is not an abstract legal proposition for the Plaintiffs:  they are entitled to exercise their Second Amendment right to keep and bear arms for lawful self-protection now and in the future.  Although Plaintiffs (or their estates) could bring an after-the-fact tort suit against an assailant and possibly win money damages, only permanent

16

injunctive relief against Defendant can redress the ongoing deprivation of their Second Amendment rights.  *See Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (enjoining the City of Chicago's ban on firing ranges because "If [plaintiffs are] right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books.").

Finally, as the Supreme Court has held, "if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'"  *Whole Woman's Health v. Hellerstadt*, 136 S. Ct. 2292, 2307 (2016) (ordering declaratory and injunctive relief from unconstitutional abortion regulations) (quoting *Citizens United v. FEC*, 558 U.S. 310, 333 (2010)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to grant summary judgment in their favor, issue a declaratory judgment that Section 131J violates the Second and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and issue an order permanently enjoining Defendant from enforcing Section 131J against them.


Respectfully submitted,


Gregory D. Cote, BBO# 553926
gcote@mccarter.com
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
617-449-6500 – o
617-326-3098 – f

/s/ Michael E. Rosman
Michael E. Rosman*
rosman@cir-usa.org
Michelle A. Scott*
scott@cir-usa.org
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave., N.W., Suite 625
Washington, D.C. 20036
202-833-8400 – o
202-833-8410 – f
*pro hac vice