UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER MARTEL, DONNA MAJOR,
and LYN BATES,

                                    Plaintiffs,

                    v.

MAURA HEALEY, in her official capacity as
Attorney General of Massachusetts,

                                    Defendant.

CIVIL ACTION
NO. 17-cv-10248-DPW

Leave to file granted
on June 5, 2017

**MEMORANDUM OF ATTORNEY GENERAL MAURA HEALEY
IN SUPPORT OF HER CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MAURA HEALEY
ATTORNEY GENERAL

Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: June 7, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

BACKGROUND ........................................................................... 1

    I.    History and Safety of Electrical Weapons ...................................... 1

    II.   The Commonwealth's Regulation of Electrical Weapons .............. 4

    III.  The Plaintiffs ................................................................. 6

ARGUMENT .............................................................................. 6

    I.    Electrical Weapons Are Not "Arms" Protected by
        the Second Amendment ................................................... 6

        A.   *Heller, McDonald,* and *Caetano* .......................... 7

        B.   Electrical Weapons Are Not Protected Because They
            Are Not Lineal Descendants of Weapons In Common Use
            When the Second Amendment Was Ratified,
            Nor Are They In Common Use Today ............................. 9

            1.   Electrical Weapons Are Not Lineal Descendants
               of Founding-Era Weapons ..................................... 11

            2.   In the Alternative, Electrical Weapons
               Are Not In Common Use Today ........................... 14

               a.   Electrical Weapons Are
                   Not Widespread ......................................... 14

               b.   Electrical Weapons Are Dangerous
                   and Unusual ............................................. 17

        C.   The Record Does Not Establish that Electrical
            Weapons Are Typically Possessed by Law-Abiding
            Citizens for Lawful Purposes .............................. 19

    II.   Even If Electrical Weapons Were Protected by the Second
        Amendment, Section 131J Should Be Upheld Because
        the Plaintiffs Have Access to Adequate Alternative
        Weapons for Self-Defense ............................................. 20

III.    Even If Electrical Weapons Were Protected by the Second
        Amendment, Section 131J Would Survive Constitutional
        Scrutiny ......................................................................................22

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Caetano v. Massachusetts,*
    136 S. Ct. 1027 (2016) ....................................................................8, 9, 16

*Cavanaugh v. Woods Cross City,*
    625 F.3d 661 (10th Cir. 2010) ....................................................................4

*Clark v. Jeter,*
    486 U.S. 456 (1988)....................................................................22

*Commonwealth v. Appleby,*
    380 Mass. 296, 402 N.E.2d 1051 (1980) ..................................................17

*Daggett v. Comm'n on Gov'tl Ethics & Election Practices,*
    172 F.3d 104 (1st Cir. 1999)....................................................................2

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)........................................................... *passim*

*Estate of Armstrong v. Village of Pinehurst,*
    810 F.3d 892 (4th Cir. 2016) .............................................................3, 18

*Florida Bar v. Went for It, Inc.,*
    515 U.S. 618 (1995)....................................................................23

*Fontenot v. Taser Int'l, Inc.,*
    736 F.3d 318 (4th Cir. 2013) .................................................................. 18

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ........................................................10, 11, 21

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ............................................................22, 25

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ..............................9, 10, 14, 17, 21, 22, 25

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) .................................................................21

*Hightower v. City of Boston,*
    693 F.3d 61 (1st Cir. 2012) .............................................................19, 22

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981)................................................................................23

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ................................................................14

*James v. State*,
    239 Ga. App. 541, 521 S.E.2d 465 (1999)..............................................20

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012)..............................................................21, 23

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) .............................................10, 11, 18, 22, 25

*Kyllo v. United States*,
    533 U.S. 27 (2001)................................................................................10

*Lee v. Metro. Govt. of Nashville & Davidson Cnty.*,
    596 F. Supp. 2d 1101 (M.D. Tenn. 2009)..............................................18

*Massachusetts v. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012) ......................................................................2

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014)..........................................................................24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..........................................................................6, 7

*McGuire v. Reilly*,
    260 F.3d 36 (1st Cir. 2001) ..................................................................23

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ..................................................................2

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015)........................................................ *passim*

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ..............................................................10

*People v. Hall*,
    18 N.Y.3d 122, 960 N.E.2d 399 (2011)..................................................20

*Powell v. Tompkins*,
    783 F.3d 332 (1st Cir. 2016) ..................................................................19

*Rideout v. Gardner*,
    838 F.3d 65 (1st Cir. 2016) ....................................................................24

*Russell v. Wright*,
    916 F. Supp. 2d 629 (W.D. Va. 2013) .....................................................18

*State v. Delgado*,
    298 Or. 395, 692 P.2d 610 (1984) ...........................................................10

*State v. Gay*,
    151 N.C. App. 530, 566 S.E.2d 121 (2012) ..............................................20

*State v. Kessler*,
    289 Or. 359, 617 P.2d 94 (1980) ...............................................................8

*State v. Rivera*,
    216 N.C. App. 566, 716 S.E.2d 859 (2011) ..............................................20

*Turner Broadcasting Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................................22

*United States v. Agron*,
    921 F.2d 25 (2d Cir. 1990) ......................................................................18

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ................................................................22, 24

*United States v. DeCastro*,
    682 F.3d 160 (2d Cir. 2012) ....................................................................21

*United States v. Jones*,
    565 U.S. 400 (2012) ................................................................................10

*United States v. Miller*,
    307 U.S. 174 (1939) .........................................................................7, 8, 10

*United States v. Sampson*,
    486 F.3d 13 (1st Cir. 2007) ......................................................................20

*United States v. Wallace*,
    800 F.2d 1509 (9th Cir. 1986) ..................................................................18

*Woollard v. Gallagher*,
        712 F.3d 865 (4th Cir. 2013) ...................................................................22

*Wright v. District of Columbia*,
        No. 1:16-cv-1556-JEB (D.D.C.) ..............................................................15

**Federal Statutes and Regulations**

U.S. CONST. amend. II ...............................................................................................6

**Massachusetts Statutes and Regulations**

501 Code Mass. Regs. 8.04(1) .............................................................................5, 24

501 Code Mass. Regs. 8.05 ..................................................................................5, 24

501 Code Mass. Regs. 8.05(1) ...................................................................................5

501 Code Mass. Regs. 8.05(2) ...................................................................................5

G.L. c. 140, § 122C ..................................................................................................21

G.L. c. 140, § 122D ..................................................................................................21

G.L. c. 140, § 131(a) ................................................................................................ 21

G.L. c. 140, § 131J ...........................................................................................1, 4, 5, 24

**Massachusetts Session Laws**

St. 1986, c. 212 ..........................................................................................................4

St. 2004, c. 170, § 1 ...................................................................................................4

St. 2004, c. 170, § 2 .............................................................................................5, 24

**Miscellaneous**

Amnesty Int'l, *Annual Report: United States of America 2013* .............................3

Blackstone, 4 COMMENTARIES ON THE LAWS OF ENGLAND (1769) .......................18

A. Dennis et al., *Acute Effects of TASER X26 Discharges in a Swine Model*,
        63 J. TRAUMA 581 (2007) ...........................................................................3

J. Dunlap, The New–York Justice (1815) ..........................................................18

T. Edson, Exec. Office of Pub. Safety & Security,
    *Electronic Control Weapons in Massachusetts: 2015* (Oct. 2016)..............5

C. Einhorn, *Gun Country: The Awakening*, N.Y. Times (2013)............................6

Z. Fagenson, *Death of Florida man after police used Taser deemed homicide*,
    Reuters (May 15, 2015) ............................................................................3

H. Hale, *A Galvanic or Electric Harpoon for Paralyzing Whales*,
    5 Scientific American 404 (1850) .........................................................13

D. Harris, *Taser Use By Law Enforcement: Report of the Use of Force
    Working Group of Allegheny County, Pennsylvania*,
    71 U. Pitt. L. Rev. 719 (2010) ................................................................2, 4

A. Herndon, *Death and questions after man is tased by Fall River Police*,
    Boston Globe (May 17, 2016) ..................................................................3

C. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment
    "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231 (2015) ...............11, 13

R. Kane & M. White, *TASER® Exposure and Cognitive Impairment*,
    15 Criminology & Pub. Policy 79 (2015)............................................3, 4

W. Krouse, Congressional Research Service, *Gun Control Legislation* (2012)....17

B. Lee, *Man dies after being shot with Taser; Worcester police chief sees
    no excessive force*, Worcester Telegram & Gazette
    (July 29, 2015) ........................................................................................3

D. McGuinness, *Three charged in alleged stun gun theft*,
    Boston Globe (July 22, 2016) ................................................................20

M. Nizza, *U.N. Torture Panel Singles Out Tasers*, N.Y. Times
    (Nov. 26, 2007) ........................................................................................4

Office of the Inspector Gen., U.S. Dep't of Justice, No. I–2007–006,
    The Bureau of Alcohol, Tobacco, Firearms & Explosives' National
    Firearms Registration & Transfer Record (2007)......................................15

A. Rostron, *Justice Breyer's Triumph in the Third Battle over the
    Second Amendment*, 80 Geo. Wash. L. Rev. 703 (2012) ..................11, 15

M. Schmidt, *"I Quit," Handcuffed Man Says in Video of Fatal Encounter with Georgia Police*, N.Y. TIMES (May 20, 2016) ..............................................3

R. Smith, *Is the Market for TASER's Tasers Tapped Out?*, THE MOTLEY FOOL (Sep. 27, 2016) ..........................................................16

J. Strote & P. Maher, *Civilian Use of a Conducted Electrical Weapon*, 33 AM. J. OF EMERGENCY MEDICINE 606.e1 (2015) ..................................24

Taser Int'l, Inc., Form 10-K, 2013 Annual Report to the U.S. Securities & Exchange Comm'n ............16

Taser Int'l, Inc., Form 10-K, 2015 Annual Report to the U.S. Securities & Exchange Comm'n ............16

Taser Int'l, Inc., Form 10-K, 2017 Annual Report to the U.S. Securities & Exchange Comm'n ........3, 16

C. Thompson & M. Berman, *Improper Techniques, Increased Risks*, WASH. POST (Nov. 26, 2015) ......................................................................3

M. Turner & M. Jumbelic, *Stun Gun Injuries in the Abuse and Death of a Seven-Month-Old Infant*, 48 J. OF FORENSIC SCIENCES 1 (2003)...............20

U.S. Patent No. 3,803,463 (filed July 10, 1972) ....................................................12

U.S. Patent No. 4,253,132 (filed Dec. 29, 1977) ....................................................12

M. White & J. Ready, *The Impact of the Taser on Suspect Resistance: Identifying Predictors of Effectiveness*, 56 CRIME & DELINQUENCY 70 (Jan. 2010).......................................................................................1, 2, 15

D. Zipes, *Sudden Cardiac Arrest and Death Following Application of Shocks from an Electronic Control Device*, 125 CIRCULATION 2417 (2012) ...........................................................................................2, 3, 13

D. Zipes, *TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans*, 129 CIRCULATION 101 (2014) ............................................3, 13

The Commonwealth prohibits civilians from possessing Tasers and stun guns. *See* G.L. c. 140, § 131J. These weapons—known as electrical weapons—inflict severe pain on their targets by shocking them with a 50,000 volt electrical current. Although it is lawful for properly trained law enforcement officers to use electrical weapons in the discharge of their official duties, the Legislature determined that the weapons should not otherwise be available in Massachusetts. The plaintiffs seek to overturn that legislative judgment, contending that the Second Amendment guarantees them the right to possess and purchase electrical weapons.

The plaintiffs' Second Amendment claim should be rejected. Electrical weapons are not "arms" protected by the Second Amendment because they are not the modern-day equivalent of weapons commonly brought to militia service in the colonial era, nor are they in common use today. But even if electrical weapons were constitutionally protected arms, the Commonwealth's restriction on the weapons does not burden the Second Amendment because the plaintiffs have access to alternative weapons, including pepper spray and firearms, for use in self-defense. Moreover, the Legislature's decision to prohibit civilians from possessing electrical weapons survives constitutional scrutiny because it is substantially related to the Commonwealth's important interest in promoting the safety of the public and of law enforcement officers.

## BACKGROUND

### I.      History and Safety of Electrical Weapons.

Electrical weapons were invented in the 1970s to provide law enforcement officers an alternative to firearms. Today, electrical weapons are synonymous with Tasers, manufactured by Taser International, Inc., which produces 95% of electrical weapons in circulation.[1]

---

[1] *See* M. White & J. Ready, *The Impact of the Taser on Suspect Resistance: Identifying Predictors of Effectiveness*, 56 CRIME & DELINQUENCY 70, 98 n. 1 (2010) (Kobick Aff., Ex. A).

1

Tasers operate in two modes: "dart" or "probe" mode, and "drive-stun" mode.[2] In dart mode, the Taser uses compressed nitrogen gas to fire two electrified wires at a target.[3] The wires are tipped with barbs that puncture the target's clothes or skin, forming a closed electrical circuit that runs from the device, through the person, and back to the device.[4] The Taser delivers an initial electrical pulse of 50,000 volts, followed by rapid 1,200-volt pulses, to the to target.[5] The electrical current "overrides the central nervous system, resulting in the loss of neuromuscular control," effectively paralyzing the target.[6] In drive-stun mode, which operates the same as a stun gun, the Taser is applied directly to the skin of the target.[7] The electrical current achieves incapacitation through pain, but not through paralysis.[8] Most deployments of Tasers are in dart mode rather than drive-stun mode.[9]

Electrical weapons are known as "less lethal" weapons: While they are less lethal than

---

This information is a legislative fact—i.e., one that bears on the justification for the statute—not an adjudicative fact—i.e., one that concerns the particular parties in a given case. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012); *Daggett v. Comm'n on Gov'tl Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999). It may, therefore, be asserted at summary judgment and need not be proved at trial. *See Massachusetts v. Dep't of Health & Human Servs.*, 682 F.3d 1, 7 (1st Cir. 2012); *Daggett*, 172 F.3d at 112. Aside from the few adjudicative facts mentioned in her Local Rule 56.1 Statement of Material Facts, the Attorney General relies on legislative facts in defense of G.L. c. 140, § 131J.

[2] *See* D. Harris, *Taser Use By Law Enforcement: Report of the Use of Force Working Group of Allegheny County, Pennsylvania*, 71 U. PITT. L. REV. 719, 725 (2010).

[3] *See id.*

[4] *See id.*

[5] *See id.*

[6] White & Ready, *supra* note 1, at 74 (Kobick Aff., Ex. A); *see also* Harris, *supra* note 2, at 726.

[7] *See* D. Zipes, *Sudden Cardiac Arrest and Death Following Application of Shocks from an Electronic Control Device*, 125 CIRCULATION 2417, 2420 (2012) (Zipes II) (Kobick Aff., Ex. B).

[8] *Id.*

[9] Harris, *supra* note 2, at 725.

firearms, they can nevertheless be deadly.[10] A 2013 study by Amnesty International concluded that more than 500 people died between 2001 and 2012 after being shocked by a Taser.[11] Peer-reviewed research has found that Tasers can cause, and have caused, cardiac arrest in humans.[12] Similar research found that two of eleven anesthetized pigs experienced acute ventricular fibrillation and died after being shocked with a Taser, one within minutes of being shocked.[13] Taser International warns that its "products are often used in aggressive confrontations that may result in serious, permanent bodily injury or death to those involved," and that its "products may be associated with these injuries."[14] Reports of fatalities following the use of Tasers and stun guns are not hard to come by[15]; in Massachusetts alone, at least two men have died in the last two years after police officers deployed Tasers against them.[16]

Aside from their lethality, electrical weapons are "designed to 'cause . . . excruciating pain.'" *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 902 (4th Cir. 2016) (quoting

---

[10] *See* R. Kane & M. White, *TASER® Exposure and Cognitive Impairment*, 15 CRIMINOLOGY & PUB. POLICY 79, 82 (2015) (Kobick Aff., Ex. C); *infra* notes 11–16.

[11] *See* Amnesty Int'l, *Annual Report: United States of America 2013*, 5 (Kobick Aff., Ex. D).

[12] *See* D. Zipes, *TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans*, 129 CIRCULATION 101, 109 (2014) (Zipes I) (Kobick Aff., Ex. E); Zipes II, *supra* note 7, at 2420 (Kobick Aff., Ex. B).

[13] *See* A. Dennis et al., *Acute Effects of TASER X26 Discharges in a Swine Model*, 63 J. TRAUMA 581, 584, 588 (2007) (Kobick Aff., Ex. F).

[14] Taser Int'l, Inc., Form 10-K, 2017 Annual Report to the U.S. Securities & Exchange Comm'n, at 17 (Kobick Aff., Ex. G).

[15] *See, e.g.*, M. Schmidt, *"I Quit," Handcuffed Man Says in Video of Fatal Encounter with Georgia Police*, N.Y. TIMES (May 20, 2016) (Kobick Aff., Ex. H); Z. Fagenson, *Death of Florida man after police used Taser deemed homicide*, REUTERS (May 15, 2015) (Kobick Aff., Ex. I); C. Thompson & M. Berman, *Improper Techniques, Increased Risks*, WASH. POST (Nov. 26, 2015) (Kobick Aff., Ex. J).

[16] See A. Herndon, *Death and questions after man is tased by Fall River Police*, BOSTON GLOBE (May 17, 2016) (Kobick Aff., Ex. K); B. Lee, *Man dies after being shot with Taser; Worcester police chief sees no excessive force*, WORCESTER TELEGRAM & GAZETTE (July 29, 2015) (Kobick Aff., Ex. L).

*Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010)) (internal alterations omitted).

The United Nations Committee Against Torture has warned that the most popular model of Taser

"cause[s] so much pain that use of it 'constitute[s] a form of torture.'"[17] One anecdotal account

describes the experience of being shocked by a Taser as follows:

> I heard a rapid ticking sound, then a loud pop, and I felt the barbs strike my back
> with a sting. Faster than I could think, the sting was replaced with something that
> felt as if every muscle, from my legs through my chest and my jaw, had suddenly
> and painfully seized up. It was like the most painful cramp I'd ever had, but giant-
> sized, body-wide, and with a sharpness that is hard to describe. My teeth locked
> together. All the while, a painful pulse went through me at regular, rapid intervals;
> it seemed to zap through me, collecting in my chest. I let out an involuntary,
> grunting sound from somewhere deep in my gut. I remember only one coherent
> thought in my head while this was occurring: STOP! STOP! GET THIS OFF ME!
> Despite my strong desire to do something, all through the Taser exposure I was
> completely paralyzed. I could not move at all.[18]

Research has found that people incapacitated by electrical weapons can suffer temporary cognitive

impairment—specifically, reduced verbal learning and memory, difficulties in concentration,

elevated anxiety, and feelings of being overwhelmed.[19]

## II.   The Commonwealth's Regulation of Electrical Weapons.

The Commonwealth first began regulating electrical weapons in 1986. Concerned over the

public safety risks posed by the weapons, the Legislature initially barred all individuals, including

law enforcement officers, from possessing electrical weapons. *See* St. 1986, c. 212.

The Legislature amended the law in 2004. *See* St. 2004, c. 170, § 1, codified at G.L. c. 140,

§ 131J.  As amended, and in its current form, the statute prohibits possession of "a portable device

or weapon from which an electrical current, impulse, wave or beam may be directed, which

---

[17] M. Nizza, *U.N. Torture Panel Singles Out Tasers*, N.Y. TIMES (Nov. 26, 2007) (Kobick
Aff., Ex. M).

[18] *See* Harris, *supra* note 2, at 726–27.

[19] *See* Kane & White, *supra* note 10, at 92–94, 98 (Kobick Aff., Ex. C).

current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." G.L. 140, § 131J. Law enforcement officers are exempted from the ban when using electrical weapons in the discharge of their official duties, as are suppliers of the weapons to law enforcement officers. *Id.*

The statute directed the Secretary of the Executive Office of Public Safety and Security ("EOPSS") to "adopt regulations governing who may sell or offer to sell such devices or weapons in the commonwealth and governing law enforcement training on the appropriate use of portable electrical weapons." *Id.* Under those regulations, law enforcement officers must complete a defensive tactics training course, a firearms training course, and a training program on the use of electrical weapons before becoming qualified to possess electrical weapons. 501 Code Mass. Regs. ("C.M.R.") 8.04(1), 8.05. The electrical weapons training must, among other things, review the mechanics of electrical weapons; discuss the medical implications of discharging electrical weapons, particularly on persons with preexisting medical conditions; train officers to become proficient in deploying electrical weapons; and highlight the place of electrical weapons in the police department's use-of-force policy. *Id.* § 8.05(1). Officers must thereafter complete annual recertification training and demonstrate ongoing proficiency with electrical weapons. *Id.* § 8.05(2).

The Legislature required electrical weapons used by law enforcement officers to include "a mechanism for tracking the number of times the device or weapon has been fired." G.L. c. 140 § 131J. Police departments must also track "the identifying characteristics, including the race and gender, of the individuals who have been fired upon." St. 2004, c. 170, § 2. This data must then be compiled and analyzed in an annual report on the deployment of electrical weapons in the Commonwealth. *Id.*; *see, e.g.*, T. Edson, Exec. Office of Pub. Safety & Security, *Electronic Control Weapons in Massachusetts: 2015* (Oct. 2016) (Kobick Aff., Ex. N).

### III.    The Plaintiffs.

The plaintiffs are three individuals who wish to purchase and possess electrical weapons in Massachusetts. *See* Pltfs' Statement of Material Facts ¶¶ 2, 4, 8, 10, 15. Plaintiffs Martel and Bates hold licenses to carry firearms in Massachusetts. *Id.* ¶¶ 3, 9. Plaintiff Major has attested that she "cannot contemplate any circumstances under which she would use a firearm, even in self-defense." *Id.* ¶ 14. However, filings in a recent case in this Court demonstrate that Major has extensive experience using firearms, has sought to purchase firearms, and holds a license to carry firearms.[20] Thus, it appears that all three plaintiffs are licensed to carry firearms in Massachusetts.

## ARGUMENT

### I.    Electrical Weapons Are Not "Arms" Protected by the Second Amendment.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of the free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller* and *McDonald v. City of Chicago*, the Supreme Court held that the Second Amendment secures an individual right, incorporated against the states, to possess a handgun in the home for self-defense. *See McDonald*, 561 U.S. 742, 791

---

[20] That complaint alleged that Donna Major "is a licensed Massachusetts firearm owner," "has been involved in the shooting sports for approximately 12 years," "has been a Massachusetts State Police certified basic firearms safety instructor for 10 years, is an NRA certified basic pistol instructor," "shoots competitively at USPSA competitions," and "was a founding member of Boston Urban Action Shooter, a USPSA-affiliated club." Complaint in *Draper v. Healey*, U.S.D.C. No. 1:14-cv-12471-NMG, ¶¶ 6.3, 41.2 (Kobick Aff., Ex. O). As in this case, Major represented that she is an MRI staff technologist at a major Boston teaching hospital and lives in Boston, Massachusetts. *See id.*; Pltfs' Statement of Material Facts ¶¶ 13, 14. Attached to the complaint were two emails from Major, in which she wrote, "I am currently in the market for an unmodified (OEM) 3rd or 4th generation Glock pistol. . . . I have a current Massachusetts LTC class A." Exhibit 5 to Complaint in *Draper v. Healey*, U.S.D.C. No. 1:14-cv-12471-NMG (Kobick Aff., Ex. P). In addition, Major was featured in a documentary that showed pictures of her shooting guns and contained audio of her describing her experiences shooting guns. *See* C. Einhorn, *Gun Country: The Awakening*, N.Y. TIMES (2013), available at http://www.nytimes.com/projects/2013/gun-country/?hp (last visited June 7, 2017).

(2010) (plurality); *Heller*, 554 U.S. 570, 635 (2008). But *Heller* and *McDonald* also explained that the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626. Rather, "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller*, 554 U.S. at 623.

Electrical weapons are not among the "arms" protected by the Second Amendment. They fail each test employed by lower courts to determine whether a weapon is constitutionally protected: They are not lineal descendants of weapons in common use at the time the Second Amendment was ratified; they are not in common use today; and there is no evidence that they are typically possessed by law-abiding citizens for lawful purposes. Because the plaintiffs cannot meet their burden of demonstrating that electrical weapons fall within the scope of the Second Amendment, their challenge to Section 131J fails.

## A. *Heller*, *McDonald*, and *Caetano*.

Although *Heller* did not adopt a definitive test for determining which weapons qualify as "arms" protected by the Second Amendment, it did offer guidance. "[T]he Second Amendment confers an individual right to keep and bear arms," the Court explained, "though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Heller*, 554 U.S. at 622 (quoting *United States v. Miller*, 307 U.S. 174, 178 (1939)). "'[O]rdinarily when called for [militia] service'" in the colonial and Revolutionary War period, the Court recounted, "'men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.'" *Id.* at 624 (quoting *Miller*, 307 U.S. at 179). This history illustrated how "the Second Amendment's operative clause further[ed] the purpose announced in its preface": At the time the Second Amendment was ratified, "'[small-arms] weapons used by militiamen and

weapons used in defense of person and home were one and the same.'" *Id.* at 625 (quoting *State v. Kessler*, 289 Or. 359, 368, 614 P.2d 94, 98 (1980)).

From this history, *Heller* made several observations about the weapons eligible for Second Amendment protection. The Court first rejected the notion that the Second Amendment extends only to "those arms in existence in the 18th century." *Id*. at 582.  Rather, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* Next, *Heller* qualified that pronouncement, announcing at least two limitations on the types of weapons eligible for protection. First, the Court explained, because the Amendment refers to arms that citizens brought from home to militia service, "the sorts of weapons protected [a]re those 'in common use at the time.'" *Id.* at 637 (quoting *Miller*, 307 U.S. at 179). "[T]hat limitation," the Court continued, is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* Thus, weapons that would not have been brought from home, such as those designed for military use, are not protected. *See id*. ("weapons that are most useful in military service—M-16 rifles and the like—may be banned"). Second, the Court explained, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625.

In *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (per curiam), the Court reaffirmed those passages from *Heller*. After the Massachusetts Supreme Judicial Court ("SJC") held, based on reasoning inconsistent with *Heller*, that stun guns are  not protected by the Second Amendment, the Court corrected that reasoning in a five-paragraph per curiam opinion and remanded for further

proceedings.[21] The Court emphasized that "the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding." 136 S. Ct. at 1028 (quoting *Heller*, 554 U.S. at 582). In addition, the Court explained, "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'" *Id.* (quoting *Heller*, 554 U.S. at 624–25). Notably, the Court did not opine on whether electrical weapons are protected by the Second Amendment or, if they are, whether Section 131J is nonetheless constitutional. *See id.* at 1027–28.[22]

### B. Electrical Weapons Are Not Protected Because They Are Not Lineal Descendants of Weapons In Common Use When the Second Amendment Was Ratified, Nor Are They In Common Use Today.

Since *Heller*, courts have concluded that weapons are eligible for Second Amendment protection only if they are (1) in common use at the time, and (2) typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255–57 (2d Cir. 2015), *cert. denied sub. nom.*, *Shew v. Malloy*, 136 S. Ct. 2486 (2016) ("*NYSRPA*"); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*").

In applying the first element of this test—whether a weapon is "in common use at the time," *Heller*, 554 U.S. at 624, 637—courts have adopted two distinct analytic approaches. Because *Heller* did not specify which "time" matters for purposes of the test, some courts have focused on

---

[21] The plaintiffs assert, incorrectly, that the Supreme Court "reversed" the SJC's decision in *Caetano*, thereby implying the invalidity of that court's judgment upholding Section 131J. *See* Pltfs' Br. at 5. In fact, the Supreme Court "vacated" the SJC's judgment and "remanded for further proceedings not inconsistent with [its] decision." *Caetano*, 136 S. Ct. at 1028. The distinction matters because the Supreme Court's disposition indicated only that the SJC's reasoning was incorrect; it did not indicate that the SJC's judgment upholding the constitutionality of Section 131J was incorrect.

[22] In a concurrence joined only by Justice Thomas, Justice Alito did express his view that electrical weapons are protected by the Second Amendment. *See Caetano*, 136 S. Ct. at 1028–33 (Alito, J., concurring in the judgment). The six other justices did not express agreement with this view.

whether a weapon is a modern-day equivalent or lineal descendant of a weapon that was in common use at the time the Second Amendment was ratified. *See, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447; *Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570; *State v. Delgado*, 298 Or. 395, 400, 692 P.2d 610, 612 (1984); *see also Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting) ("when legislatures seek to address new weapons that have not traditionally existed . . . the proper interpretive approach is to reason by analogy from history and tradition"). This approach is known as the "lineal descendants" test. *See Parker*, 478 F.3d at 398.[23] Other courts, in contrast, have focused on whether a weapon is in common use today. *See, e.g.*, *NYSRPA*, 804 F.3d at 255–56; *Heller II*, 670 F.3d at 331. This approach is known as the "popularity test." *See Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (en banc).[24]

---

[23] Although applied less frequently since *Heller*, the lineal descendants test preserves *Heller*'s requirement that any weapons protected by the Second Amendment "'have some reasonable relationship to the preservation or efficiency of a well regulated militia.'" 554 U.S. at 622 (quoting *Miller*, 307 U.S. at 178); *see also* Tr. of Oral Arg. at 77, *Heller*, 554 U.S. 570 (Roberts, C.J.) ("[W]e are talking about lineal descendants of the arms.") (Kobick Aff., Ex. Q). Because the test requires reasoning by analogy to weapons originally understood to fall within the Second Amendment's scope, it also accounts for the constitutional text and *Heller*'s interpretive methodology. A similar approach, in which courts reason by analogy to common law trespass, is used to determine whether modern-day technology effectuates a search under the Fourth Amendment. *See United States v. Jones*, 565 U.S. 400, 404–05 (2012) (installation of a GPS tracking device on a car constituted a search because "[t]he Government physically occupied private property for the purpose of obtaining information," and "such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted"); *Kyllo v. United States*, 533 U.S. 27, 34–35 (2001) ("obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area . . . constitutes a search" (quotation marks omitted)).

[24] Courts and commentators have noted that the popularity test suffers from considerable deficiencies. First, it is doctrinally inconsistent with *Heller*. *Heller* made clear that the Second Amendment "only" protects "arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia.'" 554 U.S. at 622 (quoting *Miller*, 307 U.S. at 178). But the popularity test pays no heed to whether a weapon has any relationship to a "well regulated militia," armed, as it was, by weapons from citizens' homes. It therefore ignores the prefatory

The First Circuit has not yet addressed how it will determine whether a weapon is an arm protected by the Second Amendment. Nevertheless, under either the lineal descendants test or the popularity test, electrical weapons are not "in common use at the time" and are not, therefore, entitled to Second Amendment protection.

    1.   Electrical Weapons Are Not Lineal Descendants of Founding-Era Weapons.

Electrical weapons are not modern-day equivalents of any weapon typically brought to militia service when the Second Amendment was ratified. The best source for determining the types of founding-era weapons in common use is the Militia Act of 1792. *See* Kobick Aff., Ex. R. It required militiamen to report for service with

a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a

---

clause of the Second Amendment. Second, the test depends on circular logic. If a weapon is legal in most states, it is more likely to be commonly owned, and therefore constitutionally protected under the test. Conversely, if a weapon is prohibited in most states or nationwide, it is unlikely to be commonly owned, and therefore would not be entitled to constitutional protection. Yet "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman*, 784 F.3d at 409. The test also generates instability in constitutional interpretation, because under the test weapons can gain and lose Second Amendment protection as their popularity ebbs and flows or as they become more or less regulated. *See* A. Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 712, 728 (2012). Third, as a consequence of this circular logic, the test creates perverse incentives. When a new weapon is invented, the test may encourage manufacturers to flood the market before the weapon can be regulated in order to guarantee its protection. *See Kolbe*, 849 F.3d at 141. Conversely, the test may prompt Congress to immediately ban any new weapon in order to keep the weapon from becoming common enough to attain constitutionally-protected status. That would empower Congress to define the scope of the Second Amendment, a result contrary to our constitutional structure. *See* C. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 TENN. L. REV. 231, 265–69 (2015). Fourth, the test requires courts to determine just how popular a weapon must be in order to qualify for Second Amendment protection. But nothing in *Heller* suggests any particular threshold. *See Friedman*, 784 F.3d at 409 ("what line separates 'common' from 'uncommon' ownership is something the Court did not say"). Consequently, when applying the test in a close case, a court must engage in ad hoc line-drawing. Finally, the test requires litigants to present data on the prevalence of particular weapons in the general population. That might be a straightforward task for handguns and other well-studied weapons, but it is a harder undertaking for weapons, like electrical weapons, that are not closely tracked.

> knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder.

1 Stat. 271. Commissioned officers were further required to bring "a sword or hanger and espontoon." *Id.* Artillery officers were to be "armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges." *Id.* at 272. Cavalry officers were to "furnish . . . good horses of at least fourteen hands and a half high, and to be armed with a sword and pair of pistols." *Id.* And dragoons were to "furnish . . . a serviceable horse, . . . a pair of pistols, a sabre, and a cartouch-box, to contain twelve cartridges for pistols." *Id.*

Electrical weapons are not descended from any of these weapons. The plaintiffs claim that the closest analogue is the pistol. *See* Pltfs' Br. at 6. But electrical weapons are not the modern-day equivalent of the colonial-era pistol; they are a wholly distinct category of weapon. First, electrical weapons incapacitate their victims with an electrical current instead of a bullet. They overpower the central nervous system and paralyze their targets. *See supra*, at 2. Colonial-era pistols, in contrast, operated by projecting bullets into their targets' bodies. Electrical weapons are battery-operated; colonial pistols did not depend on electricity at all. Second, in his original patent applications, the inventor of electrical weapons cited an 1850s invention—a harpoon connected to a generator that could electrocute whales—as the relevant prior art for modern-day Tasers and stun guns.[25] That indicates that if electrical weapons are lineally descended from anything, it would be the electric whaling harpoon, a weapon that was not in common use at the time the Second

---

[25] *See, e.g.*, U.S. Patent No. 3,803,463 (filed July 10, 1972) (Kobick Aff. Ex. S); U.S. Patent No. 4,253,132 (filed Dec. 29, 1977) (Kobick Aff. Ex. T).

Amendment was ratified.[26] Third, as the plaintiffs admit, Tasers propel their electrified barbs with compressed nitrogen gas rather than gunpowder.[27] For this reason, electrical weapons are not classified as "firearms" subject to regulation by the Bureau of Alcohol, Tobacco, Firearms and Explosives.[28] These differences demonstrate that electrical weapons are categorically different than pistols: They exploit different forms of technology, they were envisioned as descending from a different type of weapon, and they are regarded by regulators as categorically different weapons.

The plaintiffs contend that electrical weapons and pistols are similar because both types of weapons are small, light, easily carried, and may be readily accessible in case of an emergency. *See* Pltfs' Br. at 6. But that proves too much. Any number of weapons—for example, throwing stars and switch blades—share those same characteristics. But no one would claim that those weapons are the modern-day equivalents of the colonial-era pistol, and neither can anyone plausibly make the same claim about electrical weapons. *See* Jacobs, *supra* note 24, at 280 ("It would be hard to argue that tasers are descended from any kind of weapon that would be familiar to the founders."). In contrast, it is easy to see how the handguns at issue in *Heller* were lineally descended from the colonial-era pistol: Even though modern-day handguns incorporate technological advances, they still rely on the same basic technology and have always been regarded by the government as a form of firearm.

For these reasons, electrical weapons are not lineal descendants of the pistol in common use at the time the Second Amendment was ratified. Electrical weapons are not, accordingly,

---

[26] *See* H. Hale, *A Galvanic or Electric Harpoon for Paralyzing Whales*, 5 SCIENTIFIC AMERICAN 401, 404 (1850) (Kobick Aff., Ex. U) (showing a diagram of and describing the electric whaling harpoon, newly invented in 1850).

[27] *See* Pltfs' Br. at 6; Zipes II, *supra* note 7, at 2417 (Kobick Aff., Ex. B).

[28] Zipes I, *supra* note 12, at 101 (Kobick Aff. Ex. E); Zipes II, *supra* note 7, at 2417 (Kobick Aff., Ex. B).

"arms" protected by the Second Amendment.

### 2.   In the Alternative, Electrical Weapons Are Not In Common Use Today.

In the alternative, under the popularity test, electrical weapons are not in common use today and therefore are not protected by the Second Amendment.

### a.   Electrical Weapons Are Not Widespread.

Whether a weapon is in common use today "is an objective and largely statistical inquiry." *NYSRPA*, 804 F.3d at 256. Courts have looked to sales data, manufacturing data, and statistics on the prevalence of a particular weapon. In *NYSRPA*, for example, the Second Circuit held that assault weapons are in common use today because they represent at least "two percent of the nation's firearms, . . . amounting to approximately seven million guns." 804 F.3d at 255. It also looked to evidence that "nearly four million units of a single assault weapon, the popular AR–15, have been manufactured between 1986 and March 2013." *Id.*; *see also Heller II*, 670 F.3d at 1261 (examining manufacturing data for assault weapons and the number of assault weapons as a percentage of total firearms and rifles produced domestically).

In applying this test, courts inquire into popularity amongst private citizens, not amongst law enforcement or military officers. *See, e.g.*, *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (finding that machine guns are not in common use because "there are 175,977 pre-1986 *civilian-owned* machine guns in existence" (emphasis added)); *NYSRPA*, 804 F.3d at 25 (examining data showing that "only 7.5 percent of assault weapon owners are active law enforcement officers"). This is consistent with *Heller*. As *Heller* explained, the Second Amendment protects "the right of law-abiding, responsible *citizens* to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). The right is held by citizens, not by law enforcement officers discharging their official duties. *See id.* Moreover, the Second Amendment does not protect "weapons that are most

useful in military service—M-16 rifles and the like." *Heller*, 554 U.S. at 627. If weapons used in military and law enforcement activities were counted for purposes of the popularity test, they would likely be sufficiently numerous that they would qualify for Second Amendment protection, contrary to *Heller*. In evaluating whether electrical weapons are in common use today, then, this Court must look to their popularity amongst civilians.

The publicly available data demonstrates that electrical weapons are not commonly found in American households and generate insignificant civilian sales. A representative of Taser International, the company that accounts for 95% of all electrical weapons sales,[29] states that it has sold 275,000 Tasers to civilians since 1994.[30] This means that only 0.085% of the American populace owns an electrical weapon, assuming, favorably for the plaintiffs, that no one person owns more than one electrical weapon and that each electrical weapon sold is still in circulation.[31] As Justice Scalia said at oral argument in *Heller*, a weapon possessed by such a comparably small fraction of the population is not in common use today. *See* Tr. of Oral Argument at 22, *Heller*, 554 U.S. 570 (stating if there were in excess of 100,000 machine guns and a U.S. population of 300 million people, machine guns are not common) (Kobick Aff., Ex. Q).[32] In addition, Taser's sales of electrical weapons to civilians have steadily declined in recent years, from 6% of its net sales

---

[29] *See* White & Ready, *supra* note 1, at 98 n. 1 (Kobick Aff., Ex. A).

[30] *See* Decl. of Mark Kroll, *Wright v. District of Columbia*, No. 1:16-cv-1556-JEB (D.D.C.), ¶ 5 (Kobick Aff., Ex. V).

[31] The U.S. population is 325 million people. *See* U.S. Census Bureau, U.S. & World Population Clock, available at https://www.census.gov/popclock/ (last visited June 7, 2017).

[32] *See also* Rostron, *supra* note 24, at 711 ("Even if more than one hundred thousand Americans legally own machine guns, they still represent only a small fraction of the Nation's population, and therefore Scalia believes those weapons are 'quite unusual' and too uncommon to receive the Second Amendment's protection."). In fact, when *Heller* was decided, there were nearly 400,000 lawful machine guns registered with the federal government. *See* Office of the Inspector Gen., U.S. Dep't of Justice, No. I–2007–006, The Bureau of Alcohol, Tobacco, Firearms & Explosives' National Firearms Registration & Transfer Record 2 (2007) (Kobick Aff., Ex. W).

in 2010 to just 2.3% of its net sales in 2014.[33] And Taser itself represents that its products have gained only "limited acceptance in the private citizen market" and that the company is "materially dependent on acceptance of [its] products by law enforcement markets." Taser Int'l, Form 10-K, 2017 Annual Report to the U.S. Securities & Exchange Comm'n, at 10, 13 (Kobick Aff., Ex. G).

The plaintiffs do not dispute that, at most, 275,000 electrical weapons are owned by private citizens in the United States. *See* Pltfs' Br. at 7. Indeed, they rely on a passage from the concurrence in *Caetano* indicating that merely 200,000 electrical weapons are owned by private citizens. *See id.* (quoting *Caetano*, 136 S. Ct. at 1032–33 (Alito, J., concurring in the judgment)).[34] From this, they conclude that electrical weapons "are now widespread in the United States." Pltfs' Br. at 7. But the plaintiffs do not, and cannot, explain how those weapons could ever be considered "widespread" when they are possessed by such a tiny fraction of the U.S. population. The scarcity of electrical weapons is all the more striking, since civilians may possess electrical weapons in 45 states. *See id.* If the weapons are lawful in most jurisdictions, one would expect that they would have gained more of a foothold amongst private citizens if they were, in fact, in common use.[35]

---

[33] *See* Taser Int'l, Inc., Form 10-K, 2015 Annual Report to the U.S. Securities & Exchange Comm'n, at 6 (Kobick Aff., Ex. X) (consumer product sales accounted for 2.3% of net sales in 2014, 2.9% in 2013, and 4% in 2012); Taser Int'l, Inc., Form 10-K, 2013 Annual Report to the U.S. Securities & Exchange Comm'n, at 6 (Kobick Aff., Ex. Y) (consumer product sales accounted for 4% of net sales in 2012, 5% in 2011, and 6% in 2010).

[34] The plaintiffs misleadingly refer to this quotation as a citation to *Caetano*. *See* Pltfs' Br. at 7–8. It is not: It is a citation to Justice Alito's concurrence in the judgment in *Caetano*. While Justice Alito believed that electrical weapons were in common use today, the majority opinion in *Caetano* expressed no opinion on that issue. *See Caetano*, 136 S. Ct. at 1027–28.

[35] Even if this Court were to look at data on electrical weapons possession by law enforcement officers, in addition to civilians, the weapons could not be deemed in common use. Taser represents that it has sold 850,000 Tasers to law enforcement officers. *See* Kroll Decl., *supra* note 30, ¶ 5 (Kobick Aff., Ex. V); R. Smith, *Is the Market for TASER's Tasers Tapped Out?*, THE MOTLEY FOOL (Sep. 27, 2016) (Kobick Aff., Ex. Z). If that sum were added to the 275,000 Tasers sold to civilians, the percentage of the U.S. population that owns electrical weapons would increase only slightly, to 0.35%. Nothing from *Heller* or post-*Heller* case law suggests that such negligible market saturation qualifies as "in common use" today.

Weapons that have been deemed in common use are far more numerous than electrical weapons. The D.C. and Second Circuits determined that large-capacity magazines are in common use today because they were used in "18 percent of all firearms owned by civilians in 1994, . . . and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000," *Heller II*, 670 F.3d at 1261; and "25 million large-capacity magazines were available in 1995 . . . and nearly 50 million such magazines . . . were approved for import by 2000," *NYSRPA*, 804 F.3d at 255. The Second Circuit also found that assault weapons were in common use today because seven million of them were in circulation. *NYSRPA*, 804 F.3d at 255. And at the time the Supreme Court decided *Heller*, there were more than 100 million handguns available to civilians nationwide. *See* W. Krouse, Congressional Research Service, *Gun Control Legislation*, at 8 (2012) (Kobick Aff., Ex. AA). Electrical weapons have nowhere near this market saturation.

b.  <u>Electrical Weapons Are Dangerous and Unusual.</u>

In support of its statement that the Second Amendment only protects weapons "in common use at the time," *Heller* cited the common law "tradition of prohibiting the carrying of 'dangerous and unusual' weapons." 554 U.S. at 627. Although *Heller* did not regard that tradition as a standalone test for which weapons are "arms" under the Second Amendment, the tradition does support the conclusion that electrical weapons are not in common use today.

First, the data showing the scarcity of electrical weapons in the United States establishes that electrical weapons are unusual. *See supra*, at 14–17. Second, while electrical weapons are less lethal than firearms, they are nevertheless dangerous. At common law, weapons that were "designed and constructed to produce death or great bodily harm" and "for the purpose of bodily assault or defense" were dangerous per se. *Commonwealth v. Appleby*, 380 Mass. 296, 402 N.E.2d 1051, 1056 (1980). Examples of such weapons include "firearms, daggers, stilettos and brass

knuckles," but not "pocket knives, razors, hammers, wrenches and cutting tools." *Id.* Electrical weapons—like daggers and brass knuckles—are designed for the purpose of bodily assault or defense, not for utilitarian purposes, and therefore rank as dangerous. Indeed, accounts of people killed by electrical weapons appear throughout federal and state case law. *See, e.g. Armstrong*, 810 F.3d at 896–98; *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318 (4th Cir. 2013); *Russell v. Wright*, 916 F. Supp. 2d 629 (W.D. Va. 2013); *Lee v. Metro. Govt. of Nashville & Davidson Cnty.*, 596 F. Supp. 2d 1101 (M.D. Tenn. 2009). And courts have had little trouble concluding that electrical weapons are dangerous. *See, e.g.*, *United States v. Agron*, 921 F.2d 25, 26 (2d Cir. 1990) (per curiam); *United States v. Wallace*, 800 F.2d 1509, 1513 (9th Cir. 1986).

The plaintiffs dispute that electrical weapons are dangerous. The historical tradition cited in *Heller*, they contend, should be reframed as one involving "unusually dangerous" weapons. Pltfs' Br. at 8. But that is not what *Heller* said, nor is it an accurate description of the tradition *Heller* referenced. At common law, it was considered an affray "for a man to arm himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people." J. Dunlap, THE NEW–YORK JUSTICE 8 (1815) (Kobick Aff., Ex. BB). Or, as Blackstone put it, "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 COMMENTARIES ON THE LAWS OF ENGLAND 149 (1769) (Kobick Aff., Ex. CC).[36] None of the sources discussing affrays refer to "unusually

---

[36] Whether this tradition is formulated in the conjunctive or in the disjunctive remains unsettled. *Heller* itself used both formulations, referring first to the "restrictions and the prohibition on terrorizing people with dangerous *or* unusual weapons," 554 U.S. at 623 (emphasis added), and then later to the "historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons,'" *id.* at 627 (emphasis added). As illustrated by the quotations from Blackstone and Dunlap, the sources *Heller* cited that discuss affrays also use both formulations. *See supra*, at 18. *Heller*'s ambiguity on this point has led some courts to avoid the inquiry altogether. *See, e.g.*, *Kolbe*, 849 F.3d at 136 ("Is the standard 'dangerous *and* unusual,' or is it actually 'dangerous *or* unusual'?").

dangerous" weapons. And because *Heller* explicitly relied on this common law offense in support of its "in common use" test, the common law definition of "dangerous"—i.e., weapons designed for the purpose of bodily assault or defense—must apply.

*     *     *

For all of these reasons, the plaintiffs cannot meet their burden of demonstrating that electrical weapons are in common use. Electrical weapons fail the popularity test because they are not widespread in the United States, and they are dangerous and unusual. Electrical weapons also fail the lineal descendants test because they are not the modern-day equivalent of any founding-era weapon that would have been brought to militia service. The First Circuit has indicated that courts should proceed cautiously before expanding the scope of the Second Amendment. *See, e.g.*, *Powell v. Tompkins*, 783 F.3d 332, 348–49 (1st Cir. 2016) (declining to decide whether the Second Amendment extends outside the home); *Hightower v. City of Boston*, 693 F.3d 61, 72–74 & n. 8 (1st Cir. 2012) (same). In accordance with that approach and with the tests used to determine whether a weapon is a constitutionally protected "arm," this Court should conclude that the Second Amendment does not protect electrical weapons.

### C.   The Record Does Not Establish that Electrical Weapons Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes.

Under the second, and independent, limitation on weapons eligible for Second Amendment protection, a weapon must be "typically possessed by law-abiding citizens for lawful purposes" to be protected. *Heller*, 554 U.S. at 625. This test requires courts "to look into both broad patterns of use and the subjective motives of [weapons] owners." *NYSRPA*, 804 F.3d at 256.

The plaintiffs have introduced no evidence that shows that electrical weapons are typically possessed by law-abiding citizens for lawful purposes. Certainly some civilians do possess electrical weapons for lawful purposes, like self-defense. But civilians also use electrical weapons

19

for unlawful purposes, like committing robberies and kidnappings. *See, e.g.*, *State v. Gay*, 151 N.C. App. 530, 566 S.E.2d 121 (2012) (robbery with stun gun); *State v. Rivera*, 216 N.C. App. 566, 716 S.E.2d 859 (2011) (same); *People v. Hall*, 18 N.Y.3d 122, 960 N.E.2d 399 (2011) (same); *James v. State*, 239 Ga. App. 541, 521 S.E.2d 465 (1999) (robbery and kidnapping with a stun gun); D. McGuinness, *Three charged in alleged stun gun theft*, BOSTON GLOBE (July 22, 2016) (Kobick Aff., Ex. DD). Cases of still more horrific civilian misuse of electrical weapons—for example, the abuse and murder of a seven-month-old infant—are documented in the academic literature. *See* M. Turner & M. Jumbelic, *Stun Gun Injuries in the Abuse and Death of a Seven-Month-Old Infant*, 48 J. OF FORENSIC SCIENCES 1 (2003) (Kobick Aff., Ex. EE).

The plaintiffs cannot meet their burden where they fail to prove that electrical weapons are typically possessed by law-abiding citizens for lawful purposes. There is a strong presumption that "[s]tatutes duly enacted by [the Legislature] are . . . constitutional," and that the "burden of proving that the [statute] is unconstitutional is on the challenger." *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007). In accordance with that presumption, this Court should not conclude that electrical weapons are typically possessed by law-abiding citizens for lawful purposes. For this additional reason, the Second Amendment does not protect electrical weapons.

## II. Even If Electrical Weapons Were Protected by the Second Amendment, Section 131J Should Be Upheld Because the Plaintiffs Have Access to Adequate Alternative Weapons for Self-Defense.

In the alternative, even if this Court were to conclude that the Second Amendment does protect electrical weapons, the Commonwealth's regulation of those weapons must nevertheless be upheld. Multiple courts of appeals have held that statutes that do not substantially burden Second Amendment rights, or that impose only *de minimis* burdens, do not merit heightened scrutiny or give rise to viable Second Amendment claims. *See, e.g.*, *NYSRPA*, 804 F.3d at 259;

*Heller v. District of Columbia*, 801 F.3d 264, 273–74 (D.C. Cir. 2015) (*Heller III*); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012); *United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller II*, 670 F.3d at 1254–55. More specifically, if a statute leaves "'adequate alternatives . . . for law-abiding citizens to acquire a [weapon] for self-defense,'" no substantial burden on Second Amendment rights exists and any Second Amendment challenge to the statute must fail. *NYSRPA*, 804 F.3d at 259 (quoting *DeCastro*, 682 F.3d at 168).

Section 131J does not substantially burden Second Amendment rights because Massachusetts law ensures that the plaintiffs may acquire any number of alternative weapons for self-defense. Each of the plaintiffs holds a license to carry firearms. *See supra*, at 6 & n. 20. That license entitles them to purchase, carry, and possess large- and small-capacity handguns, rifles, and shotguns. *See* G.L. c. 140, § 131(a). In addition, unless disqualified, *see id.* § 122D, any Massachusetts resident over the age of 18 may purchase and possess pepper spray, regardless of whether the person holds a license to carry or a firearms identification card. *See id.* § 122C. Thus, to the extent the plaintiffs seek weapons less lethal than firearms, they have a ready alternative. *See id.*[37] Because Massachusetts law permits the plaintiffs to acquire alternative weapons for self-defense, their Second Amendment claim must fail. *See Friedman*, 784 F.3d at 411 (upholding assault weapons ban in part because it "leaves residents . . . ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects").

---

[37] Plaintiff Martel represents that he desires electrical weapons because he cannot bring firearms to many of the states in which he travels, and he cannot bring pepper spray on an airplane. *See* Pltfs' Statement of Material Facts ¶ 3. But the rules governing pepper spray and electrical weapons on airplanes are the same: The weapons cannot be brought in carry-on luggage, but can be brought in checked luggage. *See* Transportation Security Administration, *What Can I Bring?*, available at https://www.tsa.gov/travel/security-screening/whatcanibring.

III.    **Even if Electrical Weapons Were Protected by the Second Amendment, Section
        131J Would Survive Constitutional Scrutiny.**

Finally, even if this Court were to conclude that the Second Amendment protects electrical

weapons and that Section 131J imposes a substantial burden on Second Amendment rights, Section

131J would still survive heightened scrutiny.

The First Circuit has "recognized that *Heller* established that the possession of operative

*firearms* for use in defense of the home constitutes the 'core' of the Second Amendment."

*Hightower*, 693 F.3d at 72 (emphasis added). Laws that affect other aspects of weapons possession

are "distinct from this core interest emphasized in *Heller*." *Id.* Unlike the law invalidated in *Heller*,

Section 131J does not prohibit possession of "the quintessential self-defense weapon"—namely,

the handgun. 554 U.S. at 629. Thus, even if Section 131J implicated the Second Amendment, it

has no impact whatsoever on the plaintiffs' ability to possess "operative firearms for use in defense

of the home." *Hightower*, 693 F.3d at 72. Because Section 131J affects peripheral Second

Amendment interests, it is subject to, at most, intermediate scrutiny. Indeed, every court to subject

a weapons ban to heightened scrutiny has applied intermediate, not strict, scrutiny. *See, e.g.*, *Kolbe*,

849 F.3d at 138; *NYSRPA*, 804 F.3d at 259–61; *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th

Cir. 2015); *Heller II*, 670 F.3d at 1261–62.

In applying intermediate scrutiny, a court must ask whether the challenged enactment is

"substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461

(1988); *see also United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011). The test requires

"substantial deference to the predictive judgments" of the regulator. *Turner Broadcasting Sys.,

Inc. v. FCC*, 512 U.S. 622, 665 (1994). To survive intermediate scrutiny, the challenged regulation

must only be "reasonably adapted" to the governmental objective, *Woollard v. Gallagher*, 712

F.3d 865, 876 (4th Cir. 2013); the fit between the regulation and the government interest need not

be "perfect." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). The government can justify the fit between the statute and government interest "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted).

Section 131J withstands intermediate scrutiny. The government interests it advances— promoting the safety of the public and of law enforcement officers—are indisputably important. *See Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) ("Protection of the health and safety of the public is a paramount governmental interest."); *McGuire v. Reilly*, 260 F.3d 36, 48 (1st Cir. 2001) ("increas[ing] public safety" is "precisely the sor[t] of interes[t] that justif[ies] some incidental burdening" of rights).

Section 131J is substantially related to those interests. The Legislature reasonably determined that electrical weapons pose a significant risk to public safety and to the safety of law enforcement officers. The weapons can be deadly, particularly when deployed incorrectly or against vulnerable populations like children, pregnant women, and persons with mental illness. *See supra*, at 2–3 & nn. 11–16. Indeed, more than 500 people died between 2001 and 2012 after being struck by a Taser, and more have died since then. *See supra*, nn. 11, 15–16. Electrical weapons have been used in aid of armed robbery, kidnapping, child abuse, and torture. *See supra*, at 19–20. And even when used appropriately by law enforcement officers, electrical weapons inflict severe pain on their targets, effectively paralyzing them. *See supra*, at 2–3.

In view of this evidence, the Legislature was entitled to determine that electrical weapons should be available to trained law enforcement officers, but should not otherwise be in civilian hands, particularly when civilians have access to alternative weapons for use in self-defense. Law enforcement officers are professionals with extensive training on the safe deployment of weapons.

23

On top of that general training, officers receive intensive training on the safe deployment of electrical weapons and must demonstrate continued proficiency to remain eligible to use those weapons. *See* G.L. c. 140, § 131J; 501 C.M.R. 8.04(1), 8.05. And the deployment of electrical weapons by law enforcement officers is, and can be, carefully tracked and studied in Massachusetts. *See* St. 2004, c. 170, § 2. In contrast, civilian possession of electrical weapons could be a menace to law enforcement officers, who would risk being paralyzed by electrical weapons in the course of their regular duties. That would, in turn, leave them vulnerable to the theft of their service firearms. Unlike the deployment of electrical weapons by law enforcement, civilian deployment of electrical weapons could not be tracked and analyzed. And, "[w]ith more [electrical weapons] in unregulated, inexperienced, and untrained hands, there is more risk of inappropriate use and subsequent injury." J. Strote & P. Maher, *Civilian Use of a Conducted Electrical Weapon*, 33 AM. J. OF EMERGENCY MEDICINE 606.e1 (2015) (Kobick Aff., Ex. FF). That is especially true in light of the widespread misconception, repeated by the plaintiffs here, that electrical weapons are non-lethal. *See* Pltfs' Br. at 2.

Relying on *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014), the plaintiffs contend that Section 131J does not survive intermediate scrutiny because it is not narrowly tailored. *See* Pltfs' Br. at 13. That argument misapprehends the standard of scrutiny this Court must apply. *McCullen* was a First Amendment case involving a content-neutral regulation on speech, and in that context, intermediate scrutiny required narrow tailoring. *See id.*; *Rideout v. Gardner*, 838 F.3d 65, 72–73 (1st Cir. 2016). But in the Second Amendment context, courts do not require narrow tailoring when applying intermediate scrutiny. *See, e.g.*, *Booker*, 644 F.3d at 25–26 (upholding firearms restriction under intermediate scrutiny without mentioning narrow tailoring). In fact, none of the cases subjecting weapons bans to intermediate scrutiny undertook a narrow tailoring analysis. *See, e.g.*,

*Kolbe*, 849 F.3d at 138–41; *NYSRPA*, 804 F.3d at 261–64; *Fyock*, 779 F.3d at 1000–01; *Heller II*, 670 F.3d at 1262–64. Instead, they emphasize that courts owe "'substantial deference'. . . to 'predictive judgments of the legislature' on matters of public safety." *NYSRPA*, 804 F.3d at 263.

Particularly in the domain of public safety, "[i]t is the legislature's job . . . to weigh conflicting evidence and make policy judgments." *Kolbe*, 849 F.3d at 140. Legislatures "are allowed" to make those judgments "without second-guessing by a court." *Id.* The Massachusetts Legislature reasonably determined that trained law enforcement officers should be entitled to use electrical weapons, but that civilians should not. That judgment merits this court's deference. Even if this Court were to conclude that electrical weapons are protected by the Second Amendment, Section 131J should be upheld under intermediate scrutiny.

## CONCLUSION

For the foregoing reasons, this Court should deny the plaintiffs' motion for summary judgment, grant the Attorney General's cross-motion for summary judgment, and enter judgment in favor of the Attorney General.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

 /s/ Julia Kobick
Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
Date: June 7, 2017                    (617) 963-2559

## <u>CERTIFICATE OF SERVICE</u>

       I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 7, 2017.

/s/ Julia Kobick          
Julia Kobick
Assistant Attorney General
