UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CHRISTOPHER MARTEL, ET AL.,             )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )
                                        )          1:17-cv-10248
MAURA HEALEY, in her Official Capacity as )
Attorney General of the Commonwealth of )
Massachusetts,                          )
                                        )
        Defendant.                      )
                                        )
_____ )

**CONSOLIDATED MEMORANDUM IN REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT
AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT (Leave to file GRANTED on 6/14/2017)**

Plaintiffs submit this memorandum of law, along with Plaintiffs' opening memorandum

in support of their motion for summary judgment, their accompanying statements, and their

supplemental statement of material facts in further support of their motion for summary

judgment and in opposition to Defendant's cross-motion for summary judgment.

**I.       Introduction and response to Defendant's statement of material facts**

Plaintiffs in this case are all law-abiding residents of Massachusetts who wish to purchase

and possess Tasers or stun guns in Massachusetts. *See* Exhibits 1-3. Chris Martel works as a

sales representative for an electronics company and he travels nationwide where he oversees

installation of large commercial LCD screen displays worth many thousands of dollars.  *See* Exhibit 1.  In many cases, his work takes place late at night, after businesses hours.  In one particular instance, his work took place in a neighborhood with numerous bars and unruly drunks on the streets.  While Martel has a Class A firearms license, he would prefer to use a Taser or stun gun to protect himself in this type of situation and other situations in which more deadly force would not be necessary.  He believes the lethal force of a firearm would not be necessary or proper, particularly where the individuals involved are inebriated or mentally ill, and he fears blowback from pepper spray as well as injuring innocent bystanders.  Even though much of Martel's work takes place in states which permit Tasers and stun guns, the Massachusetts ban is so broad that it prevents him from bringing a Taser or stun gun along, since he departs from an airport in Massachusetts.

Lyn Bates is a retired computer scientist/applied mathematician with a long interest in training women in self-defense.  *See* Exhibit 2.  Bates is a founding member and Vice President of AWARE (Arming Women Against Rape and Endangerment) an organization that educates mainly women about issues of self-protection.  She has extensive firearms training and has written numerous articles on firearms and self-defense.  While Bates holds a Class A firearms license, she believes, based upon her knowledge and extensive training, that a Taser or stun gun would be preferable to a firearm in certain situations.

Defendant takes issue with Plaintiff Donna Major's statement that she "cannot contemplate any circumstances under which she would use a firearm, even in self-defense;" apparently because she has firearms training and holds a Class A license.  Def. Brief in Support of Motion for Summary Judgment at 6.  Plaintiffs have never contended otherwise.  In fact,

Donna Major is an avid competitive shooter; however, she has strong moral objections to taking

a human life under any circumstances and therefore will not use a firearm for self-defense.  *See*

Exhibit 3 par. 6.  About fifteen years ago, she joined an indoor shooting club in Dorchester in

order to learn how to shoot (she had never done so before) and became more involved in the club

partly because she enjoyed shooting and partly because she liked the people that she met there.

She also joined an organization called the "Second Amendment Sisters," which advocates self-

defense for women.  Donna Major lives in Dorchester, Massachusetts and works the night shift

as a nurse at Brigham and Women's Hospital.  Her commute requires her to drive about a half

hour north of her home, usually after 10:00 pm, through Dorchester and Roxbury, parts of which

she considers to be dangerous, or high crime areas.  Major has a Class A license and can legally

carry a concealed firearm; nonetheless, she has a strong moral aversion to taking human life and

cannot contemplate any circumstances under which she would use a firearm *against another

human being*, even in self-defense.  If the state permitted her to carry a Taser or stun gun, she

would do so for purposes of self-protection on her commute.

      While Plaintiffs agree with Defendant's proposition that the legislative facts at issue can

be asserted on summary judgment and need not be proven at trial, Plaintiffs wish to point out that

this Court is not bound by any party's assertions of legislative fact:

> the judge is unrestricted in his investigation and conclusion.  He may reject the
> propositions of either party or of both parties. He may consult the sources of perti-
> nent data to which they refer, or he may refuse to do so.  He may make an
> independent search for persuasive data or rest content with what he has or what
> the parties present.  . . .[T]he parties do no more than to assist; they control no
> part of the process.

Fed. R. Evid. 201(a) Advisory Committee Note (quoting Edmund Morgan, *Judicial Notice*,

57 Harv. L. Rev. 269, 270-71 (1944)).  *See also* Ann Woolhandler, *Rethinking the Judicial Reception of Legislative Facts*, 41 Vand. L. Rev. 111, 112 (1988).

## II.     Electrical weapons are arms under the Second Amendment.

### A.  Defendant's suggestion that Tasers and stun guns are not arms protected by the Second Amendment is incorrect.

According to *District of Columbia v. Heller*, the Second Amendment guarantees "the individual right to possess and carry *weapons* in case of confrontation."  554 U.S. 570, 592 (2008) (emphasis added).  *Heller* ruled and *Caetano* reiterated that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms."  *Heller*, 554 U.S. at 582; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027 (2016).  Defendant's contention that Tasers and stun guns are not protected is simply wrong.  And as a matter of fact, the Mass.gov webpage titled "Massachusetts Law About Guns and Other Weapons" cites to *Caetano* for the proposition that "a stun gun is protected by the Second Amendment."  *See http://www.mass.gov/courts/case-legal-res/law-lib/laws-by-subj/about/weapons.html*  No court has held otherwise.

### B.  *Heller* does not require arms to be lineal descendants of weapons in common use at the time the Second Amendment was ratified.

Heller makes it clear that the Second Amendment right is not limited to arms suited to the militia.  As *Heller* explained, the right to bear arms "did not refer only to carrying a weapon in an organized military unit" but also included doing so as part "of the natural right of defense."  *Heller*, 554 U.S. at 585.  Accordingly, any weapon that could be used either for militia duty or for private self-defense qualifies as an "arm" under the Second Amendment.  Lower courts have read *Heller's* reference to the various weapons that militia members would bring to their militia service (such as swords and knives) as protecting those arms "in common use at the time."  *Id.* at

624-25, 627. But nothing in *Heller* requires protected arms to be direct descendants of colonial weapons. Quite the contrary, in *Heller*, the Court specifically analogized Second Amendment rights to the First Amendment's protection for modern forms of communications, such as the internet. *Id.* at 582.

**C. Defendant's contention that Tasers and stun guns are not lineal descendants is incorrect.**

In any event, Tasers and stun guns are in fact the modern versions of many of the handheld weapons militia members kept at home and brought along to their service. A contact stun gun shares many characteristics with close combat arms like knives, and bayonets. *See* Def. Brief at 11-12. Whereas a Taser on the other hand, having a greater range, serves many of the same purposes as a rifle or a pistol, for combat from farther away. As stated in Plaintiffs' opening memorandum, the inventor of the original Taser named it a "rifle," and the ATF regulated his invention as a firearm. And Defendant's contention that electrical weapons are "wholly distinct" simply because they are battery operated and colonial pistols did not use electricity is disingenuous at best. The same comparison could be made about modern websites and colonial newsletters, but no one would seriously argue that speech on websites is not protected by the First Amendment. So whether this Court concludes that a modern Taser is closer to a rifle, or the defendant's harpoon (really just a specialized type of sword), or a combination of the two, it is clearly an "arm" for purposes of the Second Amendment *even if* lineal descendancy were a prerequisite to Second Amendment protection.

**D. Tasers and stun guns are widespread.**

After *Heller* courts have considered various types of statistical data to determine whether a weapon is popular enough to be considered "in common use." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015), *cert. denied sub. nom.*, *Shew v. Malloy*,

136 S. Ct. 2486 (2016).  But the line between "common" and "uncommon" ownership is something the Court did not define.  *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir.), *cert. denied*, 136 S. Ct. 447 (2015).  As a result, case law shows considerable variety as to the relevant statistics and the threshold needed to establish common use.

Some courts have considered the total numbers of a particular weapon. *See New York State Rifle & Pistol Ass'n*, 804 F.3d at 255 (holding that large-capacity magazines are in common use solely because a high absolute number:  50 million).  Other courts have considered percentages.  *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (holding that AR–15s are not in common use because only "9% of the nation's firearms owners have assault weapons.).  And recently in *Caetano*, two Justices of the Supreme Court stated that the relevant statistic for determining whether stun guns are in common use is the number of states that permit a particular weapon, noting that stun guns are "widely owned and accepted as a legitimate means of self-defense across the country."  *Caetano*, 136 S. Ct. at 1033.

The variety in approaches suggests that raw numbers, percentages, and number of jurisdictions can all be relevant inquiries depending on the weapon considered.  In this case, it makes no sense to rely on raw numbers or percentages, since Tasers are quite expensive weapons, costing approximately $1,000.  No one would take seriously the argument that a rare and highly valuable antique pistol or revolver was any less protected by the Second Amendment simply because there are only a few in existence.  Moreover, the numbers of generic stun gun sales are not reliably tracked, since they are offered by a number of different manufacturers.  The fact that Tasers and stun guns are already legal in 45 states, (and as noted in Plaintiffs' opening brief, several other states and municipalities are in the process of voluntarily lifting their bans in

recognition of their unconstitutionality) necessarily leads to the conclusion that Tasers and stun

guns are wide spread.  *See* Plaintiffs' brief in support of motion for summary judgment at 10-11.

And even if the court considers raw numbers, more than 18,000 law enforcement agencies and

some 275,000 civilians use Tasers, hardly a miniscule number. *See* Exhibit 4, Kroll Dec. par. 5.

Given their modest cost compared to a Taser, one could reasonably conclude that the number of

generic stun guns in circulation could well be many times the number of Tasers.

### E.  Tasers and stun guns are neither unusual nor dangerous.

Notwithstanding Defendant's contention to the contrary, for an arm to be excluded from

Second Amendment protection, it must be both unusual and dangerous.  *Heller,* 554 U.S. at 627.

Tasers are neither.  *See* Exhibit 4, Declaration of Mark Kroll pars. 5, 25, 28.  A Taser is about as

safe as a common electrical fence.  *Id.* at par. 25.  It is difficult to comprehend how a Taser, a

weapon deliberately designed not to kill or maim and is "almost never fatal," (Volokh, *Nonlethal*

*Self-Defense, (Almost Entirely), Nonlethal Weapons, and the Right to Keep and Bear Arms and*

*Defend Life*, 62 STAN. L. REV. 199, 204 (2009)), if ever, could be banned in accord with *Heller*

as a "dangerous and unusual weapon" when *Heller* plainly protects a very deadly weapon:

handguns.  As Justice Breyer pointed out in dissent, handguns, are employed in "well over

60,000 deaths and injuries in the United States each year," *McDonald v. City of Chicago*, 561

U.S. 742, 924 (2010), but are nevertheless the "quintessential self-defense weapon" for Second

Amendment purposes.  *Heller*, 554 U.S. at 629.   Tasers and stun guns are significantly less

deadly than firearms, which are constitutionally protected and widely allowed in Massachusetts.

The appropriate question to ask is how deadly a Taser or stun gun is compared to a firearm.  *See*

*Friedman*, 784 F.3d at 409 ("What should matter to the 'danger' question is how deadly a single

weapon of one kind is compared with a single weapon of a different kind.").

Defendant's characterization of Tasers and stun guns as dangerous per se under the common law because they are "designed to for the purpose of bodily assault or defense," *see* Def. Brief at 17-18, likewise is wrong on two prongs. First of all, Tasers were actually designed to minimize bodily harm; that is why they are so popular with law enforcement. *See* Kroll Dec. pars. 7, 10-29. Secondly, that description pertains to all firearms. Firearms are dangerous weapons designed for bodily assault or defense, yet they are protected under the Second Amendment. It is beyond dispute that Tasers and stun guns are less dangerous than firearms.

Tasers in particular are reasonably safe given their purpose. To date, there have been approximately five million Taser exposures to humans and yet there has been no documented case of a Taser causing an electrocution. *See* Kroll Dec. pars. 6, 28. This is by design. *See* Kroll Dec. pars. 10-29. Simply put, human skeletal and cardiac muscle cells have different physical and electrical structure, and Tasers take advantage of these differences. The electrical current emitted by a Taser is specifically designed to trigger skeletal muscle rather than cardiac muscle, and therefore cannot cause cardiac arrest through electrocution. *See* Kroll Dec. pars. 21-27. In fact, Tasers are so safe that police officers routinely undergo a Taser exposure during their training. *See* Kroll Dec. par. 32. When the rare Taser injury does occur, it usually results from a fall to the ground following the shooting and these injuries are usually quite minor. *See* Kroll Dec. par. 32. *See also* William P. Bozeman, et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects* 53 Annals of Emergency Med. 480 (April 2009). None of Defendant's cited examples contradict these facts; rather, they are simply egregious examples of the injuries and deaths that can occur when police officers use excessive force, in these instances, multiple and prolonged Taser exposures. *See Armstrong v. Village of Pinehurst*, 810 F.3d 892, 897 (4th Cir. 2013) (subject was Tasered five

separate times in contact stun mode); *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 323 (4th Cir.

2013) (subject Tasered multiple times); *Lee v. Metro. Govt. of Nashville & Davidson Cnty.*, 596

F. Supp. 2d 1101, 1109 (M.D. Tenn. 2009) (subject Tasered nineteen times and later shot in

contact stun mode by multiple officers).

In fact, increased use of Tasers by police has actually reduced injuries to both suspects

and officers.  *See* Kroll Dec. para. 28-29; John M. McDonald et al., *The Effect of Less-Lethal*

*Weapons on Injuries in Police Use-of-Force Events*, AM. J. PUBLIC HEALTH 2268 (December

2009); Bruce Taylor et al., *Comparing Safety Outcomes in Police Use-of-Force Cases for Law*

*Enforcement Agencies that Have Deployed Conducted Energy Devices and a Matched*

*Comparison Group that Have Not: A Quasi-Experimental Evaluation*.  *See also State v.*

*DeCiccio*, 105 A.3d 165, 193 (Conn. 2014) (the more limited lethality of dirk knives compared

to firearms provides strong support for the conclusion that dirk knives also are entitled to

protected status under the Second Amendment).

There is simply no reason to believe that Tasers or stun guns in the hands of law-abiding

citizens would be any more dangerous than they are in the hands of police.  Indeed, citizens have

far fewer opportunities to use Tasers or stun guns than do police, because civilians are only

justified in using them for self-defense.  When a civilian uses a Taser in self-defense, the chance

of the attacker being seriously injured is far less than if the victim uses hand to hand force, a

knife, or a firearm.  Even pepper spray presents risks.  Subjects have actually died after being

pepper sprayed by police, albeit usually when there are underlying health conditions like asthma,

serious cardiac problems, or substantial drug intoxication.  *See* Charles S. Petty, *Deaths in Police*

*Confrontations When Oleoresin Capsicum is Used* (Feb. 2004) (report submitted to U.S. Department of Justice) available at https://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf.

All weapons used in self-defense present some risks.  A fist fight with an attacker carries substantial risk of bodily injury or death.  Likewise, a contact weapon requires the victim to wait until the attacker is within arms' reach.  Pepper spray can blow back.  And actually discharging a firearm in self-defense poses unique dangers to the victim and innocent bystanders not presented by Tasers or stun guns.

First, simply accessing a firearm under the stress of an imminent attack can itself result in a self-inflicted injury, even to trained law enforcement officers.[1]  A self-inflicted Taser exposure is far less serious than a self-inflicted gunshot wound.  Second, a firearm discharge always presents a serious risk to bystanders.  Even trained police officers often miss their intended targets.[2]  The overall risk of hitting an innocent bystander is lower with a Taser than with a

---

[1] *See e.g.,* Patrick Tolbert, *University of Texas Officer Shot When Gun Goes Off While Holstered,* KXAN (May 17, 2016), available at http://kxan.com/2016/05/17/officer-hurt-in-accidental-shooting-on-on-university-of-texas-campus/; *Police Chief Accidentally Shoots Himself For The Second Time,* COUNTERCURRENT NEWS (January 2, 2015), available at http://countercurrentnews.com/2015/01/police-chief-accidentally-discharges-for-the-second-time/; Meredith Jogensen, *Lancaster Officer Accidentally Shoots Self,* WGAL (February 9, 2016), available at http://www.wgal.com/news/breaking-lancaster-officer-accidentally-shoots-self/37895650; Cory Shaffer, *CMHA Police Officer Accidentally Shot In The Leg At Tri-C Gun Range,* CLEVELAND.COM (May 5, 2016), available at http://www.cleveland.com/metro/index.ssf/2016/05/cmha_police_officer_accidental_1.html.

[2] A recent study of New York City police found that officers engaged in gun fights had an accuracy rate of only 18 percent, rising to 30 percent accuracy when the suspect was not shooting back.  Nate Rawlings, *Ready Fire, Aim: The Science Behind Police Shooting Bystanders*, Time Magazine (September 13, 2013), available at http://nation.time.com/2013/09/16/ready-fire-aim-the-science-behind-police-shooting-bystanders/.  *See also,* Scott Glover, Matt Laid, Accidental Gunshots Vex LAPD, LA Times (August 17, 2006), available at http://articles.latimes.com/2006/aug/17/local/me-guns17.

firearm, partly because they have a shorter range.  Civilian Taser models have a range of only 15 feet.  *See* Kroll Dec. par. 33.  A bullet shot out of a handgun can be deadly hundreds of yards away—and in an urban environment like Boston, an errant bullet would likely strike something or someone well before traveling even 50 yards.[3]  Third, any weapon can be taken away and used against the victim.  Even highly trained police officers have been shot by unarmed suspects using the officer's firearm.[4]  The consequences to a victim who has her Taser wrestled away by an assailant are less serious than if she lost her firearm.

Discharging a firearm against another person can have serious psychological ramifications even for police.  *See* Alexis Artwohl, Loren W. Christensen, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight* (1997).  If a victim can defend herself using a less deadly weapon like a Taser or stun gun, it stands to reason that she is more likely to avoid long term traumatic effects.  Finally, during the split seconds surrounding a violent confrontation, there is always the risk of a victim using excessive force, resulting in criminal charges or civil liability.  A Taser or stun gun minimizes this risk.  This is yet another reason for the popularity of non-lethal arms.

---

[3] For example, for a typical 9 mm handgun cartridge commonly carried by police officers, the bullet leaves the gun muzzle at approximately 1200 feet per second.  At 250 yards, the round is still traveling approximately 830 feet per second having lost only 1/3 of its velocity, and will have dropped less than six feet. *See http://gundata.org/ballistic-calculator/* (input data: 124 grain Speer Gold Dot hollow point with no atmospheric correction). That bullet is still potentially deadly to an innocent bystander.

[4]  *See* Associated Press, *Cases of Officers Killed by Their Own Guns Likely Will Not Change R.I. Policies* (May 2, 2005), available at https://www.policeone.com/close-quarters-combat/articles/100228-Cases-of-Officers-Killed-by-Their-Own-Guns-Likely-Will-Not-Change-R-I-Policies/; Robert Wilde, *57 Police Officers Fatally Shot by "Unarmed" Suspects Since 2000,* BREITBART.COM (August 30, 2014), available at http://www.breitbart.com/california/2014/08/30/57-police-officers-were-fatally-shot-by-unarmed-suspects/.

Thus, far from being dangerous, Tasers in the hands of citizens, just as in the hands of police, reduce injuries to both criminal attackers and to their victims. *See* Kroll Dec. pars. 4, 28-31. Far from being the type of dangerous and unusual weapon which *Heller* contemplated may be banned, Tasers or stun guns present substantially less risk to all parties than other common hand held weapons, including firearms, knives, and pepper spray. Tasers and stun guns are simply not so dangerous as to be banned under the Second Amendment.

Nor are Tasers and stun guns unusual. The Supreme Court has already rejected the view that Tasers and stun guns are unusual because they are a modern invention. *Caetano,* 136 S. Ct. at 1027-1028. Use of electronic control weapons is widespread in the United States. *See* Kroll Dec. pars. 5-6. In any event, *Heller* used the term "unusual" in the conjunctive with "dangerous," 554 U.S. at 627, meaning weapons that are more dangerous than the norm—unusually dangerous. In many excessive force cases in which law enforcement officers are sued after discharging Tasers, courts have approved of officers relying on a Taser, rather than a firearm or other more deadly weapon. *See Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation"). Plaintiffs should have the option to utilize less deadly force to defend themselves as well.

## F. Tasers and stun guns are typically possessed by law-abiding citizens for lawful purposes.

Tasers and stun guns are typically possessed by law-abiding citizens for lawful purposes. Like any arms, they can also be used for criminal purposes. But looking solely at a weapon's association with crime is insufficient. The proper inquiry is whether the weapon is dangerous and unusual in the hands of law-abiding civilians. *See New York State Rifle & Pistol Ass'n*, 804

F.3d at 256.  Furthermore, Defendant's citation of a few anecdotal cases of misuse by criminals is heavily outweighed by innumerable instances of criminal misuse of firearms.  *See id.* ("Though handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes.  That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection.").

Defendant's reference to a seven-month-old infant's death at the hands of a foster parent following repeated abuse using a contact stun gun is nothing less than horrifying, but fortunately events like these are rare.  Unfortunately, every year 1565 kids are murdered using firearms in the United States.  *See* http://www.bradycampaign.org/key-gun-violence-statistics.  And every day, seven die (four from murder).  *Id.*  Nonetheless, firearms are protected under the Second Amendment.  Furthermore, Tasers and stun guns would be less effective than firearms in committing a crime like robbery as the average person would be less afraid of a Taser or stun gun than a handgun, and a contact stun gun requires close contact to discharge, much closer than a firearm.

Contrary to Defendant's contention that civilian Taser use "could not be tracked," *see* Def. Brief at 24, civilian Taser models are in fact specifically designed to aid police in tracking misuse.  Every civilian Taser emits anti-felon identification tags ("AFIDs") each time the device is discharged.  *See* Kroll Dec. par. 34.  AFID's are confetti-like tags, that each contain a trackable serial number which allows police to trace the identity of the purchaser of the device or refill cartridge in any case of alleged criminal misuse.  *Id.*  While a Taser could conceivably be

used to commit crimes as well as for legitimate self-defense, it is much easier to track than a

firearm, since bullet casings contain no serial number recorded in a database identifying the

purchaser.  Private arms ownership always poses some risk, but our nation's founders agreed that

law-abiding citizens are entitled to keep and bear arms despite the risk that some will misuse

them.  Considering that electronic weapons are legal in 45 states and counting and all but a few

municipalities, the lack of evidence of wide spread criminal misuse is telling.

**III.    The fact that Massachusetts allows access to alternative weapons does not save the ban.**

Section 131J operates as a blanket ban, just like the unconstitutional ban in *Heller.*  Like

the *Heller* ban, Section 131J bans possession of Tasers and stun guns even inside the home

where the Second Amendment right is at its apex, even for law-abiding citizens like Plaintiffs

who have undergone extensive training and background checks.  Because of its breadth, the ban

implicates core Second Amendment rights.  *Heller* speaks mostly about guns because the

plaintiff in *Heller* challenged an absolute ban on handguns.  But the Court in *Heller* concluded

that the Second Amendment codifies a preexisting "individual right to possess and carry

*weapons* in case of confrontation."  *Id.* at 592 (emphasis added).  And in *Caetano,* the Court

made clear that the Second Amendment "extends, prima facie, to all instruments that constitute

bearable arms . . . "  *Caetano*, 136 S. Ct. at 1027, plainly encompassing Tasers and stun guns.

Because Section 131J significantly burdens Plaintiffs' rights to keep and bear the arms they seek

to use for self-defense, *even within their homes*, it violates the Second Amendment.  Plaintiffs

are not (as Defendant implies) asking the Court to "expand[] the scope of the Second

Amendment" in this case.

The fact that other weapons are available to Plaintiffs does not save the ban.  *See Heller*, 554 U.S. at 629 ("It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed.  The plaintiffs in *Heller* had access to long guns, yet the Court found the blanket ban on handguns unconstitutional.  Likewise here, the availability of alternative weapons does not save the ban.  In many cases, pepper spray is not an effective weapon, and it too presents its own set of risks.  And even though Plaintiffs can legally carry firearms, there are many situations in which Plaintiffs would prefer to have the option of a Taser or stun gun, particularly where more deadly force is not legal or appropriate.  And practically speaking, even though Plaintiff Donna Major is a trained competitive shooter and could legally use a firearm for self-protection, she will not do so because she has a moral aversion to taking a human life for any reason.  *See* Exhibit 3 at par. 6.

This Court need not consider whether a more narrow ban would be constitutional.  While Plaintiffs believe the right to keep and bear electronic arms extends outside the home, this Court need not reach that question in this case, since Section 131J operates as a categorical ban on all possession of Tasers and stun guns by all civilians, and is unconstitutional.  Whether a ban on carrying Tasers and stun guns in public or in sensitive places such as schools would be constitutional, must await the legislature's enactment of such a law.  Plaintiffs here are *not* seeking an unfettered right to bear Tasers and stun guns free from any regulation or oversight.  Plaintiffs here challenge Section 131J's absolute ban on the civilian possession and use of a class of arms typically used by law-abiding citizens for self-defense.  *See Heller,* 554 U.S. at 628.

## IV.     Section 131J cannot survive any sort of heightened scrutiny.

*Heller* interprets the Second Amendment as "elevat[ing] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S.

at 635, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.  Since Section 131J criminalizes possession of Tasers and stun guns by responsible, law-abiding citizens for all purposes, even self-defense in the home, it is plainly facially unconstitutional, just like the blanket ban at issue in *Heller*.  The ban sweeps broadly to prevent law-abiding persons from using electronic weapons in any circumstances, even for legal self-defense in the home.  There is no close means ends fit to the ban.  Accordingly, it cannot survive strict scrutiny nor even intermediate scrutiny.

Of course Massachusetts has an important state interest in curbing crime and violence.  But this interest is insufficient to justify a complete ban on civilian possession of Tasers and stun guns, even in the home.  Though Tasers or stun guns could conceivably be used for crimes as well as for legitimate self-defense, that is true of any arm, and arms ownership always poses some risk.  But the Second Amendment protects the right of law-abiding citizens to keep and bear arms despite the risk that some will misuse them.  If that is true for deadly weapons like handguns, it is especially true for weapons that are significantly less lethal, including Tasers and stun guns.  Electronic weapons are legal and widely available, yet there is no evidence of any widespread criminal use.  Charitably, any suggestion by the state that a complete ban on civilian use is needed in order to prevent widespread violence is speculation at best.  And there is no evidence in the record that the population of Massachusetts is any more likely to commit violent crimes with electronic weapons than the residents of other states.

The First Circuit has recognized that *Heller* established that possession of arms for the defense of the home constitutes the core right of the Second Amendment.  *Hightower v. City of Boston*, 693 F.3d 61, 72 (2d Cir. 2012); *United States v. Booker*, 644 F.3d 12, 25 n. 17 (1st Cir.

2011) ("While we do not attempt to discern the 'core' Second Amendment right vindicated in

Heller, we note that Heller stated that the Second Amendment 'elevates above all other interests

the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'").  And

as in *Heller*, the core Second Amendment right of self-defense in the home is implicated here.

Section 131J completely bans an entire class of arms.  The ban substantially burdens core Second

Amendment rights because it forecloses one of the most effective forms of less lethal self-

defense, a particularly substantial burden on anyone who has moral qualms about using a firearm

against a human being.  Thus, strict scrutiny should apply.  Indeed, the D.C. Circuit held in

*Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense

protected by the Second Amendment" must be subjected to strict scrutiny.  *Heller v. District of

Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011).  *See also id.* at 1266

But even if this Court applies intermediate scrutiny, Section 131J still fails.  As the

Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of

constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518,

2535 (2014), *see also id.* at 2542, 2548 (Scalia, J., concurring), and possess a "close fit between

ends and means," *id.* at 2534 (majority opinion).  Here, that close fit is absent.  And even if such

a regulation need not be narrowly tailored, Section 131J fails any means-ends fit test as a matter

of law, because the means chosen, i.e., a complete ban, substantially burdens the core Second

Amendment right of law abiding citizens to possess an entire class of arms for self-defense

purposes even within the home.  It would likewise fail the "substantial relationship" test the First

Circuit applied in *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), since Section 131J

applies without exception to the very "law-abiding, responsible citizens" the Second Amendment

was designed to protect.  *Heller*, 554 U.S. at 635.  The record is bereft of any evidence that

banning law-abiding citizens from possessing Tasers and stun guns is necessary to advance the

state's interest in promoting safety.  (On the contrary, the ban could lead to a few more citizens

carrying firearms for self-protection.)  Although intermediate scrutiny does not require the

government to adopt the least restrictive means available to advance its interest, "the government

must demonstrate that alternative measures that burden substantially less [protected conduct]

would fail to achieve the government's interests." *McCullen*, 134 S. Ct. at 2540.  This,

Massachusetts cannot do.   Much like the complete ban in *Heller* there is no state interest

sufficient to justify such a substantial burden on the core conduct protected by the Second

Amendment.

Section 131J fails as a matter of law for another reason as well.  The Massachusetts ban

has no connection to public safety, because no basis exists to conclude that Massachusetts or the

United States has a widespread (or in fact any) problem with the criminal misuse of Tasers or

stun guns.  In order to satisfy intermediate scrutiny, a regulation must be "substantially related to

the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533

(1996).  "The burden of justification is demanding and it rests entirely on the State." *Id.*  Here,

Massachusetts simply cannot meet that burden, because there is no evidence that the ban

advances public safety.

Even if Massachusetts could show that banning law-abiding citizens from possessing

Tasers and stun guns in their homes advances public safety in some de minimis way, this interest

could easily be achieved by enacting less onerous regulatory measures similar to those used for

other legal arms, such as handguns.  Recognizing this fact, many states have enacted more

narrowly tailored regulations on the possession and use of electrical weapons in lieu of an

outright ban. For instance, the Commonwealth of Virginia prohibits possession of electronic arms on school grounds, and by felons outside the home. *See* Va. Code 18.2-308.1, Va. Code 18.2-308.2. Massachusetts has similar regulations prohibiting firearms in or near schools and universities. *See* Mass. Gen. Law. Ch. 269 section 10(j). "In short, [Massachusetts can] not [show] that it seriously undertook to address the problem with less intrusive tools readily available to it," *see McCullen*, 134 S. Ct. at 2539, but instead "has too readily foregone options that could serve its interests just as well" without substantially burdening Second Amendment rights. *Id.* at 2537.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendant's motion for summary judgment, grant summary judgment in their favor, issue a declaratory judgment that Section 131J violates the Second and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and issue an order permanently enjoining Defendant from enforcing Section 131J against them.

Respectfully submitted,

Gregory D. Cote, BBO# 553926
gcote@mccarter.com
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
617-449-6500 – o
617-326-3098 – f

/s/ Michelle A. Scott
Michelle A. Scott*
scott@cir-usa.org
Michael E. Rosman*
rosman@cir-usa.org

CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave., N.W., Suite 625
Washington, D.C. 20036
202-833-8400 – o
202-833-8410 – f
*pro hac vice*

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on June 28, 2017.

/s/ Michelle A. Scott

Michelle A. Scott