UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MARTEL, DONNA MAJOR, and LYN BATES,<br><br>Plaintiffs,<br><br>v.<br><br>MAURA HEALEY, in her official capacity as Attorney General of Massachusetts,<br><br>Defendant. | CIVIL ACTION<br>NO. 17-cv-10248 |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

To promote the safety of the public and of police officers, the Commonwealth prohibits civilians from possessing electrical weapons. *See* G.L. c. 140, § 131J. The plaintiffs ask this Court to declare that statutory prohibition unconstitutional by holding, for the first time, that the Second Amendment protects Tasers and stun guns and that the Commonwealth's regulation of those weapons does not survive constitutional scrutiny. Neither proposition is legally tenable, and this Court should accordingly grant the Commonwealth's cross-motion for summary judgment.

**ARGUMENT**

Since *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts have concluded that, to qualify for Second Amendment protection, a weapon must be (1) in common use at the time, and (2) typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255–57 (2d Cir. 2015), *cert. denied sub. nom.*, *Shew v. Malloy*, 136 S. Ct. 2486 (2016) ("*NYSRPA*"); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*"). Electrical weapons are neither. The weapons are not in

1

common use at the time because they are not lineal descendants of weapons commonly used when the Second Amendment was ratified, nor are they widely used by civilians today. Moreover, the plaintiffs have failed once more to offer evidence that electrical weapons are typically used by law-abiding citizens for lawful purposes. They therefore have failed to meet their burden to establish that electrical weapons are protected by the Second Amendment.

I. **Electrical Weapons Are Not Lineal Descendants of Weapons Commonly Brought to Militia Service at the Time of the Founding.**

Under either the lineal descendants test or the popularity test, electrical weapons are not in common use at the time.

The plaintiffs contend that the lineal descendants test is inconsistent with *Heller* for two reasons: (1) "the Second Amendment right is not limited to arms suited to the militia," and (2) *Heller* "specifically analogized Second Amendment rights to the First Amendment's protection for modern forms of communications, such as the internet." Pltfs' Consolidated Mem. (Doc. No. 30) ("Pltfs' Opp.") at 4, 5. Both of these points in fact show that the test is consistent with *Heller*.

As to the first point, *Heller* stated that "the Second Amendment confers an individual right to keep and bear arms, . . . though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Heller*, 554 U.S. at 622 (quoting *United States v. Miller*, 307 U.S. 174, 178 (1939)). The lineal descendants test accounts for this reasoning by limiting constitutional protection to weapons that are modern-day equivalents of weapons "in common use at the time" the Second Amendment was ratified. *See Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570. Because "'[small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same'" at the time of ratification, *Heller*, 554 U.S. at 625 (quoting *State v. Kessler*, 289 Or. 359, 368, 614 P.2d 94, 98 (1980)), the test looks to the weapons that were commonly used in self-

defense and on militia duty. And it requires a court to assess whether a modern-day weapon is analogous to those founding-era weapons. Thus, contrary to the plaintiffs' contention, the lineal descendants test does not accord constitutional protection only to weapons suited to eighteenth century militia duty; indeed, in the decision affirmed by *Heller*, the D.C. Circuit held that modern-day handguns are lineal descendants of the founding-era pistol that was brought to militia duty. *See Parker*, 478 F.3d at 398.

As to the second point, *Heller*'s analogy between Second Amendment protections and the First Amendment's protection of modern forms of communication is precisely the methodology embraced by the lineal descendants test. *Heller* clarified that "[j]ust as the First Amendment protects modern forms of communications, . . . and the Fourth Amendment applies to modern forms of search," the Second Amendment extends to weapons "that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Recognizing this, the lineal descendants test likewise employs reasoning by analogy: Under the test, modern-day versions of weapons originally understood to fall within the Second Amendment's scope are constitutionally protected. *See* Deft's Br. at 10 n. 23. Thus, contrary to the plaintiffs' contention, the lineal descendants test is consistent with *Heller*.

The plaintiffs next contend, in the alternative, that electrical weapons satisfy the lineal descendants test because stun guns are lineal descendants of founding-era knives and bayonets, and Tasers are lineal descendants of founding-era rifles or pistols. Pltfs' Opp. at 5. But the plaintiffs make no effort to explain what pertinent features a stun gun shares with colonial-era knives or bayonets. In any event, the analogy is self-evidently inapt and overinclusive. As for the Taser, the plaintiffs say that it "serves many of the same purposes as a rifle or pistol, for combat from farther away." *Id.* But the observation that a Taser serves the same purposes as a rifle or pistol—namely,

bodily assault or defense—does not make it a lineal descendant of those weapons, because all weapons share that purpose. And the plaintiffs do not demonstrate, through evidence, that the 15-foot range of a civilian Taser, *see* Pltfs' Opp. at 11, is comparable to that of a founding-era rifle or pistol. Furthermore, regardless of whether Tasers were once regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), today Tasers are not classified as "firearms" subject to ATF regulation.[1] For these reasons, and the additional reasons stated in the Attorney General's opening brief, Tasers and stun guns are not lineal descendants of any weapon in common use at the time the Second Amendment was ratified.

## II.     Electrical Weapons Fail the Popularity Test Because They Are Not Widespread.

With respect to the popularity test, the plaintiffs agree that, in determining whether a particular weapon is in common use today, courts typically look to the total numbers of a particular weapon in circulation and the percentage of the U.S. population that possesses the weapon. *See* Pltf's Opp. at 6 ("[R]aw numbers, percentages, and number of jurisdictions can all be relevant inquiries depending on the weapons considered."). Nevertheless, the plaintiffs claim that it "makes no sense [for this Court] to rely on raw numbers or percentages" because Tasers can be expensive, costing $1,000, so few people have them. *Id.* The plaintiffs therefore urge this Court to determine whether electrical weapons are in common use today by looking only to the number of jurisdictions that permit civilian possession. *Id.* at 6–7.

For multiple reasons, this argument is misplaced. First, even when a banned weapon is expensive, courts still examine the total number of weapons in circulation and the percentage of the U.S. population that owns the weapon when applying the popularity test. For example, assault

---

[1] *See* D. Zipes, *Sudden Cardiac Arrest and Death Following Application of Shocks from an Electronic Control Device*, 125 CIRCULATION 2417, 2417 (2012) (Dkt. No. 27, Ex. B).

weapons, like electrical weapons, can be expensive: The Colt AR-15, a prototypical assault weapon, *see* G.L. c. 140, § 121, costs over $1,000. *See* Colt Domestic MSRP Price List 2017, at 4, *available at* www.colt.com ("2017 Colt Consumer Price List") (Colt AR-15 costs $1,099). Nevertheless, in assessing whether assault weapons are in common use today, courts look to data on the absolute numbers of assault weapons in circulation and the percentage of the U.S. population with an assault weapons. *See, e.g.*, *NYSRPA*, 804 F.3d at 255–56; *Heller II*, 670 F.3d at 1261.

Second, the only authority the plaintiffs cite for their alternative metric—one that would examine the number of jurisdictions that permit civilian possession of a weapon—is the two-justice concurrence in *Caetano*. *See* Pltfs' Opp. at 6 (citing *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1033 (2016)). That concurrence in the judgment was not controlling, of course, and the views it espoused were not embraced by the six justices in the *Caetano* majority. *See id.* at 1027–28.

Moreover, even if this Court were to consider the number of jurisdictions that permit electrical weapons possession, that factor would cut *against* constitutional protection for the weapons. As its name suggests, the popularity test can be justified conceptually as a proxy for consumer demand and self-defense preferences. *See* C. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 TENN. L. REV. 231, 270–72 (2015). The more demand for a weapon, the reasoning goes, the better the justification for according it constitutional protection. *See id.* The fact that Tasers and stun guns are legal in many jurisdictions, but that so few civilians possess those weapons, indicates that electrical weapons are not widely chosen for self-defense and that consumer demand for the weapons is tepid at best.

Ultimately, no matter what metric this Court uses, it is apparent that electrical weapons are not widely used today. The only evidence before this Court demonstrates that, since 1994, Taser

International, Inc. has sold 275,000 electrical weapons to civilians, total,[2] and that Taser International is responsible for 95% of the total sales of Tasers and stun guns nationwide.[3] The plaintiffs speculate "that the number of generic stun guns in circulation could well be many times the number of Tasers," Pltfs' Opp. at 7, but they have introduced no evidence to back up that speculation, and their speculation is contrary to the only evidence before this Court. Thus, this Court should not conclude that the total number of electrical weapons in circulation is significantly greater than 275,000.

The plaintiffs insist that 275,000 is "hardly a miniscule number," Pltfs' Opp. at 7, but they offer no basis for that conclusion. No court has found that a weapon possessed by such a tiny fraction of American civilians—only 0.085% of the populace—is constitutionally protected under the popularity test. Indeed, the cases finding weapons in common use today involved weapons that were orders of magnitude more widespread in American households. *See, e.g.*, *NYSRPA*, 804 F.3d at 255 (seven million assault weapons in circulation and 25 million large-capacity magazines available in 1995); *Heller II*, 670 F.3d at 1261 (4.7 million large-capacity magazines imported into the United States between 1995 and 2000). The popularity test would be an illusory limitation on the scope of the Second Amendment if a weapon possessed by so few civilians could qualify as "in common use today."

---

[2] *See* Decl. of Mark Kroll, *Wright v. District of Columbia*, No. 1:16-cv-1556-JEB (D.D.C.), ¶ 5 (Dkt. No. 27, Ex. V) ("Approximately 275,000 civilian TASER ECDs [Electronic Control Devices] have been sold to the general public since 1994.").

[3] *See* M. White & J. Ready, *The Impact of the Taser on Suspect Resistance: Identifying Predictors of Effectiveness*, 56 CRIME & DELINQUENCY 70, 98 n. 1 (2010) (Dkt. No. 27, Ex. A) ("There are competitors to Taser, including Stinger Systems and Law Enforcement Associates, but Taser dominates the market with approximately 95% of conducted energy device (CED) sales in the United States.").

**III.   There Is No Standalone "Dangerous and Unusual" Test, But In Any Event, Electrical Weapons Are Both Dangerous and Unusual.**

Attempting to pivot away from the lineal descendants and popularity tests, the plaintiffs contend that "for an arm to be excluded from Second Amendment protection, it must be both unusual and dangerous." Pltfs' Opp. at 7. This argument fundamentally misunderstands *Heller*.

*Heller* did not adopt a standalone test that requires courts to assess whether a weapon is "dangerous and unusual." Instead, *Heller* stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 627 (citing *Miller*, 307 U.S. at 179). This passage makes clear that the "important limitation on the right to keep and carry arms" is that the Second Amendment only protects those weapons "in common use at the time." *Id.* The "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller* said, "fairly supported" that "limitation." *Id.* It would upend *Heller*'s reasoning to transform a historical tradition that supports a limitation on a right to a standalone test for determining the scope of that right.

Moreover, the historical tradition is described inconsistently—in both the disjunctive and the conjunctive—in *Heller* itself. The Supreme Court first referred to the "the prohibition on terrorizing people with dangerous *or* unusual weapons," *Heller*, 554 U.S. at 623 (emphasis added), and then later to the "historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons,'" *id.* at 627 (emphasis added). The sources cited by *Heller* likewise formulated that tradition in both the disjunctive and the conjunctive. *See, e.g.*, Blackstone, 4 COMMENTARIES ON THE LAWS OF ENGLAND 149 (1769) (Dkt. No. 27, Ex. CC) ("dangerous or unusual weapons"); J. Dunlap, THE NEW–YORK JUSTICE 8 (1815) (Dkt. No. 27, Ex. BB) ("dangerous and unusual

7

weapons"). Were this Court to treat the historical tradition as a standalone test, it would have to decide whether the Second Amendment excludes "dangerous *and* unusual" weapons, or "dangerous *or* unusual" weapons. *See Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc) ("Is the standard 'dangerous *and* unusual,' or is it actually 'dangerous *or* unusual'?"). It is implausible that the Supreme Court intended for the scope of the Second Amendment to turn on a common law tradition that the Court itself described inconsistently.

To the extent the historical tradition is relevant at all to the constitutional analysis, it nonetheless supports the conclusion that the Second Amendment does not protect electrical weapons. Electrical weapons, as discussed, are not widely used by civilians, and therefore rank as unusual. *See supra*, at 6–7. And because electrical weapons are "designed for the purpose of bodily assault or defense," they would have been regarded as dangerous under the common law. *Commonwealth v. Appleby*, 380 Mass. 296, 402 N.E.2d 1051, 1056 (1980). The plaintiffs contend that "Tasers were actually designed to minimize bodily harm," Pltfs' Opp. at 8, but they do not dispute that electrical weapons were, at a minimum, designed for bodily defense, and are therefore encompassed by the common law definition of "dangerous." More fundamentally, they do not explain why that definition should not apply to a centuries-old common law tradition that criminalized the carrying of dangerous or unusual (or dangerous and unusual) weapons.

Instead, the plaintiffs devote most of their brief to arguing that electrical weapons are responsible for fewer fatalities and injuries than handguns. *See* Pltfs' Opp. at 7–12. That may be true, but it is irrelevant to the question of whether electrical weapons are constitutionally protected. Nothing in *Heller* suggested that the Second Amendment protects all weapons less dangerous than handguns. That reasoning would imply, implausibly, that throwing stars, nunchuks, and other obscure weapons with no relationship to a well regulated militia might nevertheless be eligible for

8

Second Amendment protection. Nor did *Heller* suggest that one weapon—namely, handguns—set a benchmark for demarcating the scope of the Second Amendment as to all other weapons.

**IV.    The Plaintiffs Have Failed to Introduce Any Evidence that Electrical Weapons Are Typically Possessed by Law Abiding Citizens for Lawful Purposes.**

To qualify for Second Amendment protection, a weapon also must be "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also NYSRPA*, 804 F.3d at 256; *Heller II*, 670 F.3d at 1260. The plaintiffs do not dispute that the "burden of proving that the [statute] is unconstitutional is on the challenger," and that they therefore carry the burden to establish that electrical weapons are protected by the Second Amendment. *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007). Nevertheless, the plaintiffs still have introduced no evidence it is typical for law-abiding civilians to possess electrical weapons, or that the weapons are typically possessed for lawful purposes. At most, the plaintiffs contend that "Tasers and stun guns would be less effective than firearms in committing a crime like robbery," Pltfs' Opp. at 13, but they offer no evidence to back up that speculation. This Court therefore lacks evidence necessary "to look into both broad patterns of use and the subjective motives of [weapons] owners." *NYSRPA*, 804 F.3d at 256. The plaintiffs have failed to carry their burden of establishing that electrical weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

For all these reasons and the reasons set forth in the Attorney General's opening brief, this Court should conclude that electrical weapons are not protected by the Second Amendment.[4]

---

[4] The plaintiffs cite a stray statement on the Massachusetts Trial Court Law Libraries website suggesting that stun guns are protected by the Second Amendment. *See* Pltfs' Opp. at 4. That statement is a misreading of *Caetano* and does not represent the position of the Attorney General or the Commonwealth of Massachusetts.

9

## V. Section 131J Survives Constitutional Scrutiny.

Finally, even if this Court were to review Section 131J under intermediate scrutiny, the statute should be upheld. The plaintiffs contend that because the Legislature regulated electrical weapons by prohibiting civilians from possessing them, Section 131J must be unconstitutional. *See* Pltfs' Opp. at 16–17. But that does not follow at all. Many courts of appeals have subjected statutory bans on classes of weapons to intermediate scrutiny and concluded that the ban comports with the Second Amendment. *See, e.g.*, *Kolbe*, 849 F.3d at 139–41 (assault weapons and large-capacity magazines); *NYSRPA*, 804 F.3d at 261–64 (assault weapons and large-capacity magazines); *Fyock v. Sunnyvale*, 779 F.3d 991, 1000–01 (9th Cir. 2015) (large-capacity magazines); *Heller II*, 670 F.3d at 1262–64 (assault weapons and large-capacity magazines).

Because prohibitions on civilian possession of classes of weapons can be constitutional, the question for this Court in applying intermediate scrutiny is whether Section 131J is "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). That requires a "reasonable, if not perfect, fit between the [challenged statute] and [the state's] interest in protecting public safety." *Kolbe*, 849 F.3d at 140–41. The plaintiffs recognize that the objective of Section 131J—protecting the safety of the public and of law enforcement officers—is important. *See* Pltfs' Opp. at 16. And Section 131J is substantially related to that objective, for all the reasons described in the Attorney General's opening brief. The plaintiffs rejoin that "[t]here is simply no reason to believe that Tasers or stun guns in the hands of law-abiding citizens would be any more dangerous than they are in the hands of police." *Id.* at 9. But the Legislature was entitled to conclude that because law enforcement officers are professionals trained in safe deployment of weapons in general, and electrical weapons in particular, they should be entitled to possess electrical weapons, while civilians should not. It was reasonable for the

10

Legislature to determine that civilians, lacking the training of police officers, are less likely to understand that prolonged exposure to electrical weapons can be fatal.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Attorney General's opening brief, this Court should grant the Attorney General's Cross-Motion for Summary Judgment.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

 /s/ Julia Kobick
Julia Kobick, BBO #680194
Assistant Attorney General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108
(617) 963-2559

Date: July 17, 2017

## **CERTIFICATE OF SERVICE**

      I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 17, 2017.

                                                /s/ Julia Kobick
                                                Julia Kobick
                                                Assistant Attorney General